Filed 11/3/22  P. v. Lopez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

ANGEL ZACARIAS LOPEZ, JR., et al.,

    Defendants and Appellants.

E073016

(Super.Ct.No. INF1601092)

OPINION

APPEAL from the Superior Court of Riverside County.  Otis Sterling III, Judge. Affirmed in part, reversed in part, remanded with directions.

Gordon S. Brownell, under appointment by the Court of Appeal, for Defendant and Appellant, Angel Zacarias Lopez, Jr.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant, Jose Antonio Armendariz.

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant, Cesar Anthony Monzon, Jr.

Randi Covin, under appointment by the Court of Appeal, for Defendant and Appellant, Andrew Malanche.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland and Julie L. Garland, Assistant Attorneys General, Robin Urbanski, Donald W. Ostertag and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

California District Attorneys Association and Gregory D. Totten, Chief Executive Officer, as Amicus Curiae on behalf of Plaintiff and Respondent.

Defendants and appellants Angel Zacarias Lopez, Jr., Andrew Marquie Malanche, Jose Antonio Armendariz, and Cesar Anthony Monzon, Jr., were jointly tried and convicted on charges, including first degree murder, relating to a fatal drive-by shooting. We reject most of defendants' challenges to the judgments, but several prison prior enhancements imposed in sentencing Monzon and Armendariz must be vacated under Senate Bill No. 136 (2019-2020 Reg. Sess.) (Senate Bill 136). Another post-trial change in the law, Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill 333) requires us to vacate the jury's findings on certain enhancement and special circumstance allegations. We order the matter remanded for the People to have an opportunity to retry those allegations, and for resentencing. In all other respects, we affirm the judgment.

## I. BACKGROUND

Late into the evening on August 6, 2016, and continuing after midnight, 22-year-old Adrian Valdez, along with a group of family and friends, gathered outside in front of

his family's house in Indio. The house is within territory claimed by the criminal street gang North Side Indio (NSI), and there was NSI graffiti on the house's front curb.[1] There is some evidence that Valdez was an NSI member, though there is also some evidence to the contrary. There is a long history of violence between NSI and Jackson Terrace (JT), another criminal street gang that claims territory in Indio. In 2014, a JT member named Julian "JJ" Palomino was murdered by an NSI member. In 2016, about two weeks before the events in this case, Palomino's uncle, George Pacheco, was also murdered. Although Pacheco was not gang-affiliated, his murder was apparently gang-motivated; the murderer profanely denounced JT and proclaimed "This is North side" or "This is North Side Indio" before shooting him. It is undisputed that Monzon is a JT member. Lopez and Armendariz are not JT members, but Lopez is Palomino's cousin, and Armendariz is Lopez's cousin.[2] Malanche is not a member of JT, but there is evidence that he is friends with at least one JT member (Monzon), as well as Lopez.

According to the prosecution, around 6:00 p.m. on August 6, 2016, Monzon visited the Palomino family home, where both Palomino and Pacheco had lived. That evening, Monzon, Lopez, and Malanche, along with Monzon's girlfriend Jane Doe and several others—but not Armendariz—visited Palomino's gravesite. Doe's presence created some tension; she grew up in NSI territory, had NSI friends, and had previously

---

[1] The graffiti was the letters "NSI" and "SMG," which stand for "North Side Indio" and "Sick Made Gangsters." A gang expert testified that Sick Made Gangsters was a "smaller subset" of NSI, "still belonging to the larger gang."

[2] Nevertheless, Armendariz is apparently not a blood relative of either Palomino or Pacheco. The record does not establish exactly how the family trees intertwine.

3

dated NSI members. Lopez, in particular, expressed dissatisfaction about her presence given her ties to NSI. After a short time, the group dispersed. Monzon had Doe drive him to pick up bullets—she could not remember exactly where, perhaps at her house—and then drop him off where several other JT gang members lived. The gun Monzon was carrying then, as he often did, was a .38 revolver.

At 12:42 a.m. on August 7, 2016, two vehicles—an SUV and an older model sedan—drove past Valdez's family's house and made a U-turn. As they passed by again, people in the vehicles began shooting at the group outside using at least three types of firearms, including two handgun types (a .22 caliber semiautomatic and a .38 caliber revolver) and a 30-30 caliber rifle. Members of Valdez's group fired at the vehicles from at least two handguns (a .40 caliber and a 9 mm caliber). Who fired first was a disputed trial issue. After passing Valdez's house, the SUV stopped in front of the house next door, while the sedan passed the SUV and drove away. Both front doors of the SUV opened momentarily, as more shots were fired at Valdez's group, before the doors closed and the SUV, too, drove off.

During the shooting, a bullet entered the right side of Valdez's chest, with a trajectory slightly from back to front. He died from that wound shortly after being taken to a hospital. The bullet broke into pieces in Valdez's body, so the pathologist could not determine its caliber. The pathologist also could not determine the distance from which he had been shot.

Evidence led police to believe that defendants were the ones who shot at Valdez and his group. Among other things, the shooting was captured by a nearby home's video surveillance camera. The video showed the sedan was a Chevrolet Caprice. A few minutes after the shooting, Lopez arrived with Malanche at a local emergency room, driving a Chevrolet Caprice with a shattered window. An investigating officer later concluded, from broken glass inside the car, that it had been shot into. Both Lopez and Malanche had gunshot wounds; Lopez's was only superficial, but a bullet had entered Malanche's back and lodged near his spine. Lopez attempted to leave once Malanche was getting treated, but he had left the keys in the ignition, and a hospital security guard took them to prevent anyone driving the car away before police arrived. After realizing he did not know where the keys were, Lopez was observed putting some items from the car into a backpack and walking around to the side of the building.

Around that time, a hospital security guard observed another vehicle enter the hospital lot and park. Two men, one wearing a black tank top and the other a black shirt, exited the vehicle. The security officer ran inside the hospital to inform a police officer who had arrived. As the security guard exited the hospital again, he saw the two men approaching Lopez. The male in the black tank top ran away when the police officer exited the hospital. The prosecution's theory was that the man in the black tank top was Armendariz; we will discuss that theory in more detail below. A different police officer contacted the second man, who did not run away. The hospital security guard, however,

did not direct the police to the car the men had arrived in. Our record contains no further information about either the second man or the vehicle.

The police officer followed Lopez and found him, holding the backpack, behind bushes on the hospital's side. The backpack contained (1) a .22 caliber handgun with an empty magazine; (2) a .38 caliber revolver with six expended shell casings; and (3) more .22 and .38 caliber ammunition. Another box of .22 caliber ammunition was found behind the bushes where Lopez had been, and additional live .38 caliber rounds were found in the Caprice and in Malanche's clothing, and he had a handgun holster on his waistband. Ballistics analysis showed that all the .22 caliber shell casings and .38 caliber bullets found at the shooting scene came from the guns in Lopez's backpack. Lopez's fingerprints were on the .22 caliber pistol's magazine.

Surveillance video of the shooting showed that the SUV was a Toyota Sequoia. Video evidence identified that vehicle by its license plate. Police recovered the Sequoia when they executed a search warrant at Armendariz's residence two days after the shooting. Someone had recently patched three bullet holes in the side of the vehicle. Police also found on the floorboards several unexpended rounds, one .22 caliber and the other .38 caliber, as well as an expended bullet slug. In Armendariz's master bedroom, police found a gun cleaning kit ("a Hoppe's gun cleaning kit for a .22 or .17 HMR round"), but no firearms or ammunition.

Monzon had been released from prison three months before the shooting, and at the time of the shooting he was wearing a GPS tracking device as a parole condition.

6

GPS data showed Monzon's location correlated with surveillance video from the shooting scene and several other locations, placing Monzon in either the Caprice or the Sequoia right before and during the shooting. Monzon removed his tracking device shortly after the shooting, and it was recovered from his father's backyard, but Monzon was not there. He was eventually arrested in Mexico. According to Doe, the morning after the shooting, Monzon told her what had happened, inculpating himself, Lopez, and Malanche; those statements will be further discussed below.

Based in part on the data from Monzon's GPS tracking device, together with surveillance video and other evidence, the prosecution offered the following version of the events. Monzon and Lopez met up with Armendariz at the home of a JT member who lives on Valencia Street, where Doe dropped Monzon off. Shortly before midnight on August 6, 2016, Monzon, Lopez, and Armendariz were in the Sequoia at a gas station near NSI territory. The three then drove around in NSI territory for about a half hour before leaving briefly and going to a convenience store. Armendariz, wearing a black tank top, was driving. From the convenience store, they returned to NSI territory, and at 12:34 a.m. they drove past Valdez's house. They then returned to the convenience store where they met Malanche, who had pulled into the store parking lot at 12:38 a.m. and waited in the Caprice. The occupants of the two cars did not stop to speak to one another; the Sequoia pulled into the parking lot, then pulled out again, and the Caprice followed. From there, the two vehicles returned to NSI territory. They went first to a

location near an elementary school, where Lopez and Monzon switched from the SUV to the Caprice. From there, they drove to Valdez's house, where the shooting occurred.[3]

All four defendants were charged with first degree murder (Pen. Code[4], § 187, subd. (a), count one), and all except Malanche (who had no prior criminal record) were charged with unlawful possession of a firearm (§ 29800, subd. (a)(1), count 2). Regarding the murder charge, the prosecution at first alleged two special circumstances as to each of the defendants: that they committed the murder by discharging a firearm from a motor vehicle (§ 190.2, subd. (a)(21)) and that they committed the murder while they were active participants in a criminal street gang (*id.*, subd. (a)(22)). The second of those special circumstance allegations, however, was dismissed on the prosecution's motion as to all defendants except Monzon.[5] For all defendants, the murder charge was also accompanied by firearms enhancement allegations (§§ 12022.5, subd. (a), 12022.53, subds. (c), (d), & (e)) and gang enhancement allegations (§ 186.22, subd. (b)(1)(C)). The

---

[3] This theory of events leaves only one of the four defendants (Armendariz) in the Sequoia. Surveillance video, however, strongly suggests at least two people were in the Sequoia during the shooting; as doors on both sides of the vehicle were opened and then closed around the same time during the gunfire. Whether this suggests other unidentified participants in the shooting (perhaps the second person who was at the hospital with the person in a black tank top who the prosecution contended was Armendariz), or a different arrangement of the four defendants between the two vehicles, was a question of fact for the jury.

[4] Undesignated statutory references are to the Penal Code.

[5] Confusingly, amended informations filed as to Lopez, Armendariz, and Malanche after this dismissal continued to allege the section 190.2, subdivision (a)(22) special circumstance. These clerical errors are not significant because the jury was asked to decide that allegation only as to Monzon.

prosecution further alleged that Monzon and Armendariz each had one prior strike conviction (§§ 667, subds. (c) & (e)(1), 1170.12, subd. (c)(1)), one prior serious felony conviction (§ 667, subd. (a)), and two prison priors (§ 667.5, subd. (b)).

At the start of trial, Lopez and Armendariz both pleaded guilty to count two. The jury convicted defendants as charged on count one, including the alleged special circumstances and firearm and gang enhancements, and found Monzon guilty on count two. In bifurcated proceedings, the trial court found true Monzon's and Armendariz's recidivism-based enhancement allegations.

The court sentenced each defendant to life in prison without the possibility of parole for the special circumstances murder, plus a consecutive indeterminate term of 25 years to life for the section 12022.53, subdivision (d) firearm enhancement.[6] For count two, Lopez also received a consecutive determinate term of 3 years, while Monzon and Armendariz each also received a consecutive determinate term of 13 years (three years, doubled to six years by a strike prior, plus five years for a prior serious felony and two one-year prison priors).[7] The court stayed punishment for the section 186.22, subdivision (b)(1) enhancements and the remaining firearm enhancements.

---

[6] More precisely, the trial court imposed the punishment described in section 12022.53, subdivision (d) as to each defendant, applying the theory of vicarious liability described in section 12022.53, subdivision (e)(1). This circumstance will be discussed below.

[7] The trial court's oral pronouncement of judgment included a three-year term on count two for Malanche. This was erroneous, as Malanche was not charged with or convicted on count two. However, the minute order of sentencing and abstract of

*[footnote continued on next page]*

9

## II.  DISCUSSION

A.  *Evidence of Out of Court Statements by Monzon*

   1.  *Additional background*

Monzon's girlfriend at the time of the shooting, Jane Doe, testified at trial for the prosecution, and she recounted statements Monzon made to her the morning after the shooting.  A police officer who interviewed Doe testified as to statements that Doe had then said that Monzon made.  These out of court statements by Monzon were admitted as to all four defendants, over their objections.

Monzon's statements described in the officer's testimony differed in some respects from those described in Doe's trial testimony.  The officer testified that in a September 2016 interview, Doe stated that Monzon had told her that he and others had been "driving around [NSI territory] looking for anybody standing outside."  Doe stated that the reason for the shooting was retaliation for the murders of Palomino and Pacheco.  Both people who had been in the car with Monzon during the shooting had been shot; Doe recalled Monzon naming Lopez as one of the people, but she did not recall the second person's name.  She did, however, identify the second person as someone she remembered seeing at the cemetery with his young child on the evening of August 6, 2016, and at trial Doe identified Malanche as that person.  Monzon also told Doe that he was certain he (Monzon) had been the one that "got" Valdez "because he was aiming right at him" as Valdez was running to the trunk of a car to retrieve a firearm.

---

judgment correctly reflect that Malanche was convicted only on count one and related enhancements, and reflect no determinate sentence.

At trial, Doe testified that Monzon told her that he and his friends "were driving through North Side Indio and something went wrong." Monzon did not identify who exactly had been with him, but he said that there had been more than one car. They were looking for someone named Esteban who had recently been in a verbal dispute with Monzon because of comments Esteban made on social media about Palomino and the circumstances of his murder. Doe testified that Monzon told her that they saw Esteban standing in front of a house, went down the street and made a U-turn, and "[w]hen they came back . . . it turned into a shootout." Doe stated that Monzon said "everybody" shot at Valdez because he ran to a car and retrieved a gun from the trunk ("they all went for him" because he "came out in front with a street sweeper"). Doe testified that Monzon told her two people he was with had been shot, but she did not recall him identifying them.

2. *Analysis*

Lopez and Malanche disagree with the trial court's ruling that Monzon's statements to Doe fall within the hearsay rule's exception for declarations against penal interest (Evid. Code, § 1230). We do not.

Evidence Code section 1230 provides that a statement is not inadmissible hearsay if it "when made, . . . so far subjected [the declarant] to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." The prosecution is required to show the declarant is unavailable, the statement was against the declarant's interests when made, and the

11

statement was sufficiently reliable to warrant admission despite being hearsay. (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).) The exception's rationale is that "'a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statements made against that interest,' thereby mitigating the dangers usually associated with the admission of out-of-court statements." (*Ibid.*) In determining whether a statement falls within Evidence Code section 1230, the trial court may consider not just the words spoken but the circumstances. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1108.) Our review is for abuse of discretion. (*Grimes*, at pp. 711-712.)

We find no abuse of discretion. Monzon was unavailable because he did not testify at trial and could not be compelled to do so. His statements to Doe were against his penal interest because he admitted his role in the shooting, including his belief that he personally had fired the bullet that killed Valdez. His statements also tended to show the shooting was premeditated and gang-related, committed in retaliation for the murders of Palomino and Pacheco by NSI members, whether directly or in response to Esteban's comments on social media. Although Monzon's description of the events also implicated Lopez and Malanche, it was nevertheless "'so far contrary to [Monzon's] interests "that a reasonable man in his position would not have [admitted it] unless he believed it to be true.""" (*People v. Brown* (2003) 31 Cal.4th 518, 536.)

Malanche and Lopez contend that Monzon's statements inculpating them "were not specifically disserving to [his] interests because they did not subject him to any additional punishment." Such reasoning, however, is inconsistent with our Supreme

12

Court's application of Evidence Code section 1230. For example, in *People v. Cortez* (2016) 63 Cal.4th 101 (*Cortez*), a declarant made statements implicating the defendant as someone with whom he "had engaged in a joint, planned drive-by shooting." (*Id.* at p. 126.) The Supreme Court rejected the defendant's argument that the declarant's "identification by name of who accompanied him was not specifically disserving of his interest." (*Ibid.*) The Court noted that the declarant knew "the defendant and her car were already in police custody," so "by identifying her, he was increasing the likelihood that evidence connecting him to the shooting would be found," and "'being linked to' defendant 'would implicate' him in a drive-by shooting for which defendant had been arrested." (*Id.* at p. 127.) Thus, the declarant's "identification of defendant by name specifically disserved his penal interest." (*Ibid.*) The Court also found it relevant that the declarant's statements "'were in no way exculpatory' or 'self serving.'" (*Id.* at p. 128; see *Grimes*, *supra*, 1 Cal.5th at p. 715 [although "portions of a third party's confession that are self-serving or otherwise appear to shift responsibility to others" should be excluded, "we have permitted the admission of those portions of a confession that, though not independently disserving of the declarant's penal interests, also are not merely 'self-serving,' but 'inextricably tied to and part of a specific statement against penal interest'"].)

Similarly, here, it was reasonable for the trial court to conclude that Monzon's identification of Lopez and Malanche specifically disserved Monzon's penal interest. Monzon admitted he was a shooter, and at least in the version of the statements that Doe

13

recounted to the police officer, he claimed to have been the shooter who personally fired the bullet that killed Valdez. He never attempted to diminish his responsibility, even though his statements also implicated Lopez and Malanche. Also, the record does not establish whether Monzon already knew Lopez and Malanche had been arrested when he spoke to Doe. Nevertheless, the statements show that Monzon knew that Lopez and Malanche had been shot and presumably had sought treatment, so police were likely to be involved. Thus, linking himself to them could implicate him in the shooting, too.

Malanche and Lopez further argue that Monzon's statements were insufficiently trustworthy to be admitted. They assert that testimony of an alleged accomplice is "inevitably suspect," especially when the alleged accomplice "does not testify and cannot be tested by cross-examination." (*Bruton v. U.S.* (1968) 391 U.S. 123, 136.) They further argue that there was "reason for Monzon to dissemble or exaggerate," because he was "likely bragging to his girlfriend, also a gang member, and seeking to enhance his reputation within the gang." They also emphasize that Monzon's "status as a convicted felon on parole further reduced the reliability of his statements."

Lopez and Monzon have not demonstrated, however, that such factors *compel* the conclusion that the statements were so unreliable that they should be excluded from evidence. (See *People v. Dalton* (2019) 7 Cal.5th 166, 207-208 [rejecting on similar grounds defendant's argument that statement was not against penal interest of declarant because he was just "'bragging or puffing'" to cellmate].) On the contrary, it was reasonable, and therefore no abuse of discretion, for the trial court to view Monzon's

14

statements as having been made in "'"'the most reliable circumstance,'" that is, '"one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures."'" (*People v. Arceo* (2011) 195 Cal.App.4th 556, 577.) We therefore will not disturb the court's determination that the statements were admissible.

Additionally, Malanche contends that the trial court should have excluded Monzon's statements "as substantially more prejudicial than probative under [Evidence Code] section 352." This issue was forfeited because it was not raised in the trial court. (Evid. Code, § 353, subd. (a); *People v. Holt* (1997) 15 Cal.4th 619, 666.) In any case, however, there was no abuse of discretion. (See *People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1366-1367.) Monzon's statements were highly probative regarding central issues in the case, including whether Lopez and Malanche took part in Valdez's murder and the motive for the shooting. The damage to the defendants' defenses flowed from the statements' probative value on relevant issues, not any sense in which the statements would "tend to inflame the jurors' emotions or cause them to punish [them] because of an emotional reaction." (*Cortez, supra*, 63 Cal.4th at p. 129.) The trial court would have been well within its discretion to admit the statements over an objection under Evidence Code section 352.

Malanche and Lopez argue that their federal constitutional right to due process was violated by the admission of Monzon's statements. This argument, however, rests on the premise that Monzon's out of court statements to Doe must be viewed as unreliable, a premise that we have already rejected. Moreover, "[t]he routine and proper application

15

of state evidentiary law does not impinge on a defendant's due process rights." (*People v. Riccardi* (2012) 54 Cal.4th 758, 809, overruled on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192.)

We conclude Malanche and Lopez have not demonstrated that the trial court erred by admitting Monzon's statements, either through testimony by the police officer who interviewed Doe or Doe's own trial testimony.[8]

### B. *Officer Testimony Regarding Surveillance Video*

The prosecution's witnesses included Jason Polanco, an Indio Police Department detective who obtained surveillance video from a nearby house that showed the shooting. Lopez and Armendariz argue that the trial court erred by allowing Polanco to testify about the video's contents, which they characterize as improper lay opinion. We find no error.

Lopez and Armendariz arguably forfeited their arguments by failing to raise a specific objection in the trial court. (See Evid. Code, § 353; *People v. Marks* (2003) 31 Cal.4th 197, 228 ["A general objection to the admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal"].) During cross-examination, in a sidebar out of the jury's presence, the prosecutor stated he intended to question Polanco about the contents of the video on redirect if defense counsel did so during cross examination, after Malanche's counsel

---

[8] It follows from our conclusion here that Malanche's request for a limiting instruction, requiring that the jury consider Monzon's statements only as to Monzon himself, and not any other defendant, was properly denied.

16

began asking such questions. Malanche's counsel conveyed his intention to object to any such prosecution questioning. Armendariz's counsel, too, expressed a general objection. Later, during questioning on redirect by the prosecutor, Armendariz's counsel objected based on the secondary evidence rule: "I'm going to have to object . . . pursuant to [Evidence Code section] 1521 and 1523." These were general objections or specific objections on other grounds, so they did not preserve for appeal the claim that Polanco's testimony was improper lay opinion.

Nevertheless, during redirect examination, Malanche's counsel objected that the video "speaks for itself," commenting that "[t]he jury can see the video on its own." An objection that something "'speaks for itself'" is not a specific evidentiary objection, but courts have sometimes treated it as an objection that the testimony is not the proper subject of *expert* opinion. (See, e.g., *People v. Sloss* (1973) 34 Cal.App.3d 74, 86.) Here, for similar reasons but in a different context, it is arguably reasonable to construe the comment that a video "speaks for itself" as an objection to improper *lay* opinion. And, under the trial court's order at the beginning of trial, an objection by any defendant was deemed an objection made by all defendants.

In any event, assuming Lopez and Armendariz did not forfeit their arguments about Polanco's testimony, we reject them on the merits. A lay witness may give opinion testimony if it is "rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony." (*People v. Leon* (2015) 61 Cal.4th 569, 601

17

(*Leon*).) We review a trial court's decision to admit lay opinion testimony for an abuse of discretion. (*Id.* at p. 600.) For the following reasons, we find no abuse of discretion.

Most of Polanco's testimony was not opinion at all, but assuming it was, there was ample reason to find it both rationally based on the detective's perception and helpful to the jury. On this point, the reasoning of *People v. Son* (2020) 56 Cal.App.5th 689 (*Son*) is instructive. In *Son*, a detective testified as to what she perceived in surveillance video of a stabbing. (*Id.* at p. 695.) In rejecting the defendant's claim that the testimony was improper lay opinion, the Court of Appeal stated that it did not "see any opinions expressed" in the detective's testimony, reasoning that she "essentially just testified to what she saw . . . If she had witnessed the actual murder and given the exact same testimony, we certainly would not characterize it as opinion testimony. It would be percipient testimony. Why does it become an opinion just because she saw it in a video?" (*Id.* at p. 697.) Assuming the testimony was opinion, however, the court found it was rationally based on the detective's perception and helpful to the jury, where she watched the video multiple times, including in slow motion. (*Id.* at pp. 695, 697.) Among other things, the detective was able to discern and point out the moment a "shiny object (which she later clarified was 'a stabbing instrument') [flew] out of defendant's right hand midway through the assault." (*Id.* at p. 695.) The Court of Appeal found such testimony helpful because it enabled the jury "to speed up the process of teasing out obscure details in the video." (*Id.* at p. 697; accord *U.S. v. Torralba-Mendia* (9th Cir.

2015) 784 F.3d 652, 659 ["an officer who has extensively reviewed a video may offer a narration, pointing out particulars that a casual observer might not see"].)

Similarly, here, both the prosecution and defense counsel asked Polanco what he saw upon close examination of the video, and he described what he saw. Among other things, Malanche's counsel showed a short portion of the video, from when "the car [was] in front of the residence," and asked if the detective saw "those little dust things that went off the ground." When the detective responded affirmatively, counsel asked if that was "consistent with . . . a bullet ricocheting on the street." The detective agreed that it was. On redirect, the prosecutor asked Polanco: "did you see anything happen prior to those ricochets with respect to the Toyota Sequoia?" He did: "I saw what I believe to be muzzle flash from the Sequoia before you actually see the ricochet." Further questioning clarified the concept of a muzzle flash: "So given that it's dark, there's a quick flash of light. Typically, when a gun is fired, you'll see muzzle flash if . . . the lighting condition's right." Further redirect questions, accompanied by repeated viewing of a few seconds of the video, focused on the order of the ricochets and muzzle flashes, as well as correlating the muzzle flashes with locations where police recovered a type of bullet casings from the street. This was mainly testimony about what was occurring on a video, not easily discernible except on close attention, like the testimony that *Son* found both rationally based on the detective's perception and helpful to the jury.

Polanco's limited testimony that went beyond literally recounting the video also was not problematic. Armendariz and Lopez suggest that distinguishing muzzle flashes

19

from other flashes of light on a video is something that requires expert opinion, rather than lay opinion. Opinions derived from a police officer's general familiarity with firearms and how they work, however, have been held "not so far 'beyond [the] common experience' that expert testimony was required." (*People v. Lewis* (2008) 43 Cal.4th 415, 504-505 [detective "properly testified as a lay witness" regarding "strike marks" on a shotgun shell recovered at a crime scene].) And Armendariz and Lopez offer no authority in support of the notion that expert scientific opinion is required to distinguish a muzzle flash from a different sort of flash of light in a video. Analogously, lay opinion is admissible to show that a person depicted in a surveillance video is the defendant, so long as the opinion is based on the witness's relevant personal knowledge. (*Leon*, *supra*, 61 Cal.4th at p. 601.) Moreover, where the video is played for the jury, the jurors can "make up their own minds" about whether the identification is reliable. (*Ibid.*) That logic applies to the testimony of a lay witness with personal knowledge of the appearance of muzzle flashes, who opines that a particular flash of light in a video appears to be one. Questions about the witness's familiarity with the appearance of muzzle flashes, or any ambiguities arising from the character of the video, generally will go to the weight, not the admissibility, of the testimony. (*Ibid.*)

Armendariz and Lopez have not demonstrated that the trial court erred by allowing Polanco's testimony regarding what he saw in the surveillance video. We therefore need not and do not address the parties' arguments about prejudice.

C. *Substantial Evidence*

Defendants have raised sundry substantial evidence challenges to their convictions, both as to substantive offenses and enhancements. We are not persuaded by any of these arguments. Although we discuss each of them in turn, we note that a recurring theme will be defendants' failure to account for the standard of review. Defendants all acknowledge, either expressly or by adopting the arguments of co-defendants, the familiar proposition that in conducting substantial evidence review an appellate court must examine the whole record in the light most favorable to the judgment. (E.g., *People v. Lindberg* (2008) 45 Cal.4th 1, 27; see also *People v. Wilson* (2008) 44 Cal.4th 758, 806 [sufficiency of the evidence standard for enhancements is same as that for convictions].) In so doing, we must "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) If the evidence reasonably justifies the trier of fact's findings, the reviewing court's opinion that the evidence might also support a contrary finding does not warrant reversal. (*People v. Jones* (2013) 57 Cal.4th 899, 961 (*Jones*); see also *People v. Kurey* (2001) 88 Cal.App.4th 840, 848-849 (*Kurey*) [". . . whether, upon review of the entire record, there is substantial evidence of solid value, contradicted or uncontradicted" to support finding].) Moreover, circumstantial evidence alone may be sufficient to connect a defendant with a crime and prove guilt beyond a reasonable doubt. (*Ibid.*) Defendants' arguments, however, are often grounded in discussions of the evidence that do not take such a deferential perspective.

21

### 1. *"Friendly fire" theory*

Defendants emphasize that it is undisputed that the evidence does not establish who fired the single bullet that struck and killed Valdez, or even what type of bullet it was. The prosecution's theory was that someone in either the Sequoia or Caprice fired the shot that killed Valdez, and all of the defendants at least intended to aid and abet that person, if they were not the direct perpetrator. (See *People v. Santamaria* (1994) 8 Cal.4th 903, 919 ["Sometimes, as probably occurred here, the jury simply cannot decide beyond a reasonable doubt exactly who did what. There may be reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other"].) Defendants' alternative theory was that Valdez was killed by "friendly fire"—a bullet fired by one of Valdez's companions—rather than by any bullet fired from the Sequoia or the Caprice. They contend on that basis that the prosecution failed to establish that defendants must be either direct perpetrator or aider and abettor, so there is insufficient evidence to support any of their convictions for murder, or the special circumstance allegations that the murder was committed while firing from a car in violation of section 190.2, subdivision (a)(21).[9]

---

[9] We "cannot look to legal theories not before the jury in seeking to reconcile a jury verdict with the substantial evidence rule." (*People v. Kunkin* (1973) 9 Cal.3d 245, 251.) We therefore do not consider whether defendants could have been convicted, for example, under the provocative act murder doctrine, which "has traditionally been invoked in cases in which the perpetrator of the underlying crime instigates a gun battle . . . and the police, or a victim of the underlying crime, responds with privileged

*[footnote continued on next page]*

This argument, however, rests on a limited subset of the evidence. Defendants essentially take the trajectory of Valdez's wound—slightly from back to front—and some ambiguity as to exactly where he was standing when he was shot, and conclude that the evidence "was consistent with the defense theory." Defendants do not account for other evidence tending to support different conclusions. For example, as the prosecution argued, the location of blood pools, from which Valdez's approximate location when shot can reasonably be inferred, combined with the locations where spent casings were recovered or not recovered, at least arguably showed the implausibility of the defense's "friendly fire" theory. The jury was also entitled to give weight to Monzon's reported certainty that he had personally fired the shot that "got" Valdez. We find no appropriate basis to disturb the jury's resolution of this conflict in the evidence.

2. *Armendariz*

Armendariz argues that the prosecution failed to present evidence sufficient to support the jury's conclusion that he was present for or involved in Valdez's shooting, let alone that he was guilty of murder. We are not persuaded.

Surveillance video gave police the license plate of the Sequoia used in the shooting. That information led them to Armendariz's residence, where they found the vehicle on August 8, 2016.[10] That was some circumstantial evidence of Armendariz's

_____

lethal force by shooting back and killing the perpetrator's accomplice or an innocent bystander." (*People v. Cervantes* (2001) 26 Cal.4th 860, 867.)

[10] Police executed the search warrant for the residence by observing until Armendariz left home (in a different vehicle than the Sequoia), and then pulling him over

*[footnote continued on next page]*

23

involvement in the shooting, as it means that the day after the shooting, he was found in possession of the involved vehicle with freshly patched bullet holes and an expended slug on the floorboard. Further, the jury was informed of Armendariz's admission that he was "in possession of a firearm at some point and time" on August 7, 2016. Additionally, surveillance video showed the Sequoia driver just before the shooting generally matched Armendariz's description, wearing a black tank top, though the video showed the driver's face for only a few seconds and from some distance. A person with a similar description, and also wearing a black tank top, arrived at the hospital shortly after Lopez and Malanche did, apparently intending to meet Lopez, but then fleeing at the sight of police. And Armendariz's familial connection with Lopez, and through Lopez to Palomino and Pacheco, suggests a motive for Armendariz to participate in the shooting. Viewed in the deferential light required, the jury's decision that this evidence, in the aggregate, constituted proof of Armendariz's presence for and participation in the shooting was a reasonable conclusion derived from circumstantial evidence.

Armendariz's arguments in support of a different conclusion focus on various "holes" in the prosecution's case against him. Among other things, the prosecution did not attempt to demonstrate that Armendariz owns the Sequoia, or otherwise explain how the vehicle's license plate led them to search Armendariz's residence. Ideally, the video surveillance footage showing a glimpse of the driver of the Sequoia would have given a closer look at his face. Armendariz, unlike Lopez and Malanche, was not implicated by

on a traffic stop. Armendariz was detained, and his wife, who was with him, went back to the residence with police to let them in.

24

the statements Monzon reportedly made to Doe, and he was not with Monzon, Lopez, and Malanche at the cemetery in the hours before the shooting.  There is no direct evidence that Armendariz was the person who attempted to repair the bullet holes in the Sequoia.  In the present procedural posture, however, such arguments are misplaced.  Our question is not whether the prosecution's case could have been stronger, but whether there is a minimum of "substantial evidence of solid value, contradicted or uncontradicted," to support the jury's decision.  (*Kurey*, *supra*, 88 Cal.App.4th at p. 848; see also *Jones*, *supra*, 57 Cal.4th at p. 961 ["If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment" (cleaned up)].)  As discussed above, there is that necessary minimum of supporting, albeit circumstantial, evidence.

Armendariz's arguments based on *People v. Kegler* (1987) 197 Cal.App.3d 72 (*Kegler*) are also not persuasive.  In *Kegler*, the defendant was accused of committing a string of robberies over about an hour, during the last of which the victim was shot and killed.  (*Id.* at p. 77.)  The perpetrator drove a car owned by a person named Wright, who testified that he had loaned the car to the defendant a few hours before the shooting in exchange for some cocaine.  (*Id.* at p. 78.)  The defendant failed to return the car the next day, as they had agreed, and several days later Wright learned that it had been impounded.  (*Id.* at p. 78.)  Police had found the car within about a day after the crimes, abandoned not far from the defendant's residence.  (*Id.* at p. 78.)  The Court of Appeal

affirmed the trial court's decision not to give an instruction, requested by the defense, on third party culpability; in closing arguments the defense conceded the prosecution had proven the defendant committed the earlier robberies, but argued that Wright committed the last of the robberies and the murder. (*Id.* at pp. 79-80.) The Court of Appeal reasoned, in relevant part, that "no evidence placed Wright at the scene of the murder or in possession of his car, indisputably used in the commission of the murder, at the time of the offense." (*Id.* at p. 80.) Additionally, although Wright and the defendant both matched physical descriptions given by witnesses, those descriptions also fit "'probably 100,000 people in Los Angeles.'" (*Id.* at p. 80.) On that basis, the Court of Appeal found the defendant had failed to present "direct or circumstantial evidence linking [Wright] to the actual perpetration of the crime." (*Id.* at p. 80.)

In support of his contention that the evidence was insufficient to demonstrate that he was in any way involved in Valdez's shooting, Armendariz analogizes the evidence against him to the evidence against Wright. (*Kegler*, *supra*, 197 Cal.App.3d at p. 80.) The analogy, however, does not withstand close scrutiny. In *Kegler*, it was undisputed that the defendant, and not Wright, had possession of the car about an hour before the robbery/murder, while he committed the earlier robberies. (*Id.* at pp. 78-79.) In contrast, there is no *evidence*, only speculation, that anyone other than Armendariz might have had possession of the Sequoia before, during, or after the shooting. In *Kegler*, the car was recovered by police near the defendant's residence, not Wright's (*id.* at p. 78), whereas the Sequoia was found in Armendariz's garage. In *Kegler*, an eyewitness to the murder

26

testified that he was "certain" that the defendant, and not Wright, was the person he saw shoot the victim. (*Id.* at p. 78.) Here, although no eyewitness definitively identified Armendariz as one of the shooters, there is also no evidence that, if credited, would exclude the possibility that he was one of the shooters. The different circumstances reasonably justify different conclusions about the evidence.

In short, we are not persuaded that the jury's decision to convict Armendariz of murder lacked the support of substantial evidence.

3. *Premeditation and deliberation*

Malanche argues that the evidence was insufficient to support the jury's conclusion that he acted with premeditation and deliberation. Armendariz makes a similar point in passing (during an argument on another issue, self defense, which we address below), asserting that "there was no evidence the defendants were executing a plan to kill members of NSI in general or [Valdez] and his companions in particular, which at least might permit an inference that they were [driving by Valdez's house] to commit a shooting." We disagree.

In the context of first-degree murder, "'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.'" (*People v. Mayfield* (1997) 14 Cal.4th 668, 767, overruled on other grounds as stated in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn.2.) "The process of premeditation and deliberation does not require any extended period of time. The true test is not the

duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." (*People v. Lee* (2011) 51 Cal.4th 620, 636 [cleaned up].)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27, our Supreme Court "identified three categories of evidence relevant to determining premeditation and deliberation: (1) events before the murder that indicate planning; (2) a motive to kill; and (3) a manner of killing that reflects a preconceived design to kill." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 663 [discussing *People v. Anderson*].) These factors "are not all required [citation], nor are they exclusive in describing the evidence that will support a finding of premeditation and deliberation." (*Ibid.*) "It also is not necessary that any of these categories of evidence be accorded a particular weight [citation], and it is not essential that there be evidence of each category to sustain a conviction." (*People v. Gonzalez* (2012) 210 Cal.App.4th 875, 887.) Rather, these factors are intended "to aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.)

Applying the factors of *People v. Anderson*, *supra*, 70 Cal.2d 15, and reviewing the evidence in the light most favorable to the judgment, sufficient evidence supports the conclusion that Valdez's shooting was the result of preexisting reflection and weighing of considerations rather than a rash impulse. The defendants' decision to arm themselves and go driving in NSI territory is reasonably interpreted as evidence that they were

28

looking for trouble. That three of them drove around for a time in NSI territory until they passed the gathering outside Valdez's family's house, then exited NSI territory briefly to meet up with an additional person in a second car, then returned to Valdez's house, where they opened fire on the group, suggests exactly what kind of trouble they were looking for. The first of the *Anderson* factors, therefore, weighs in favor of a finding of premeditation and deliberation. Second, whether simply the latest expression of the long-standing enmity between NSI and JT, or more specifically intended as retaliation for the murders of Palomino and Pacheco or for recent acts of disrespect by a particular NSI member, the evidence supports the conclusion that defendants had a motive to kill. Finally, the immediacy with which multiple people in two separate cars opened fire on Valdez's group, as well as the volume of gunshots fired, is reasonably viewed as suggesting a preconceived design to kill. Thus, each of the three *Anderson* factors supports the jury's conclusion that defendants acted with premeditation and deliberation.

Armendariz correctly points out that there was no *direct* evidence of premeditation or deliberation. Direct evidence is not, however, required; circumstantial evidence alone can constitute substantial evidence. (*Jones*, *supra*, 57 Cal.4th at p. 961.) Indeed, it is "not unusual" that intent to kill "must be inferred from circumstantial evidence surrounding the crime." (*People v. Canizales* (2019) 7 Cal.5th 591, 606.) Armendariz proposes different, more innocent inferences that he believes reasonably could be drawn from the evidence. Again, however, on substantial evidence review, such arguments are misplaced: "Although it is the duty of the jury to acquit a defendant if it finds that

29

circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.  If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." (*Jones*, *supra*, 57 Cal.4th at pp. 960-961 [cleaned up)].)

Similarly, Malanche proposes that the jury should have drawn different inferences from the evidence, arguing that "[a]lthough Monzon may have planned a gang shooting, there is insufficient evidence Malanche did."  The argument lacks merit, as there is sufficient evidence of Malanche's premeditation and deliberation even if he was not one of the overall planners.  As Malanche notes, there is some room to argue from the evidence that before the shooting he was not with the others at the cemetery where Palomino was buried.  In the same vein, it is undisputed that Malanche was not a gang member, that he had no prior criminal record, and that he was not with the other three defendants during their initial cruise through NSI territory.  But he was present in a vehicle at the scene and, based on what was found in his clothes at the hospital, Malanche had with him a holster and live rounds of .38 ammunition, matching shell cases at a scene where it was clear that multiple persons were firing from the vehicles multiple times, with plenty of time for premeditation and deliberation.  While there is no more direct evidence that Malanche pulled a trigger, it was within the jury's province to decide what

30

inferences were reasonable from these facts. (*Jones*, *supra*, 57 Cal.4th at pp. 960-961.) On this record, we find no appropriate basis to disturb the jury's determinations.

We find that substantial evidence supports the jury's finding of premeditation and deliberation.

4. *Self Defense/Defense of Another*

Lopez, Malanche, and Armendariz argue that substantial evidence does not support the jury's finding that they did not act in self-defense or defense of another. We are not persuaded.

The prosecution bears the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense or defense of another. (*People v. Cruz-Partida* (2022) 78 Cal.App.5th 32, 46.) "For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend. If the belief subjectively exists but is objectively unreasonable, there is imperfect self-defense, i.e., the defendant is deemed to have acted without malice and cannot be convicted of murder, but can be convicted of manslaughter. To constitute perfect self-defense, i.e., to exonerate the person completely, the belief must also be objectively reasonable." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 [cleaned up].) The same analysis applies when the issue is whether the defendant acted in defense of another person. (See, e.g., *People v. Randle* (2005) 35 Cal.4th 987, 994-1001, overruled on a different point in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.)

31

Generally, neither perfect nor imperfect self-defense may be "invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*People v. Enraca* (2012) 53 Cal.4th 735, 761 [cleaned up].)  However, if the defendant starts a fight using non-deadly force and the opponent suddenly escalates to deadly force, the defendant may use deadly force in defense.  (*People v. Quach* (2004) 116 Cal.App.4th 294, 301-302.)

At trial, the question of who fired first was disputed.  Defendants are simply incorrect that there is "no evidence who fired first" or that the evidence affirmatively required the conclusion that someone in Valdez's group shot first.  On the contrary, regardless of any evidence in support of the defense perspective, there was also some evidence that defendants fired first.  In addition to video surveillance evidence, which at least arguably showed defendants firing first, an eyewitness also testified that the "first shots" were fired from defendants' vehicles.  There was therefore ample basis for the jury to find the prosecution had carried its burden to prove the doctrines of self-defense or defense of another did not apply.

Lopez and Malanche emphasize that the first gunshot Polanco identified in the video surveillance footage came from the Sequoia, followed by ricochets from return fire by Valdez's group, and only then a muzzle flash from the Caprice.  Of course, Lopez and Malanche were free to argue, as they did at trial, that the jury should infer from this order of events that they were acting in self defense or in defense of others.  It is not apparent,

32

however, why the jury might be required to find that to be a plausible inference. As discussed above in relation to premeditation and deliberation, the jury was free to instead infer from the totality of the circumstances that both cars were acting in a coordinated fashion with the intent of executing a drive-by shooting, even if those in the Caprice opened fire a few moments after those in the Sequoia.

We conclude that the jury's finding that defendants did not act in self defense or defense of another was supported by substantial, albeit largely circumstantial, evidence.

5. *Discharge of firearm "from a motor vehicle"*

Defendants contend that insufficient evidence supported the jury's conclusion that Valdez was murdered by a firearm intentionally discharged "from a motor vehicle," as required for the section 190.2, subdivision (a)(21) special circumstance found true as to each of them. This contention rests on video evidence showing that during the gunfire exchange, after passing the house where Valdez's group had gathered, the Sequoia slowed to a stop for a moment and the front doors were opened before at least one additional shot was fired. An eyewitness also testified to seeing someone step out of the rear passenger door of the Sequoia and rest a gun on the hood of the vehicle to point it back at Valdez's group. From this, defendants argue that some of the shots fired at Valdez's group were not fired "from a motor vehicle" in the meaning of section 190.2, subdivision (a)(21). In defendants' view, there is no way to determine exactly which shot hit Valdez, so the jury's conclusion that Valdez was killed by a bullet shot at him "from a motor vehicle" lacks support.

The evidence, however, is reasonably interpreted to support jury's verdict. The surveillance video does not confirm the eyewitness's testimony about someone exiting the Sequoia's passenger side and shooting across its hood. To the contrary, it is more consistent with the same eyewitness's initial police statement, that someone leaned out the vehicle's rear passenger *window* and put the gun on the car's *roof*. Additionally, although the video's angle is not ideal, it is reasonably viewed as showing the occupants opening the Sequoia's doors but *not* stepping out, and instead only leaning out or pointing weapons out for a few seconds, before closing the doors and driving away. In this light, the evidence reasonably supports the conclusion that all of the shots fired at Valdez's group were by someone in either the Sequoia or the Caprice. Thus, substantial evidence supports the jury's finding that Valdez was killed by a bullet shot "from a motor vehicle" in the meaning of section 190.2, subdivision (a)(21).

6. *Gang enhancements*

In their initial appellate briefs, Armendariz, Lopez, and Malanche argue that the jury's true findings on their section 186.22, subdivision (b)(1)(C) gang enhancements lack the support of substantial evidence. After briefing was completed, the Legislature adopted Assembly Bill 333, which changed certain requirements for such enhancements. We requested, and the parties submitted, supplemental briefing regarding the effect of Assembly Bill 333. We will address that issue below. Nevertheless, we must address the parties' substantial evidence challenges to the jury's findings under the former law, as the outcome could render the supplementally briefed issues moot. (See *People v. Seel* (2004)

34

34 Cal.4th 535, 544 [unlike a reversal for trial error, "the double jeopardy clause precludes a second trial after a conviction is reversed based solely on insufficient evidence"].)

Section 186.22 enhances the punishment of a person convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (Former § 186.22, subd. (b)(1), (4).) Thus, there are "two prongs to the gang enhancement under section 186.22, subdivision (b)(1)." (*People v. Perez* (2017) 18 Cal.App.5th 598, 606.) First, the prosecution must prove that the underlying felonies were committed "for the benefit of, at the direction of, or in association with any criminal street gang." (Former § 186.22, subd. (b)(1).) Second, the prosecution must prove that the crimes were committed with "the specific intent to promote, further, or assist in any criminal conduct by gang members." (*Ibid.*)

Lopez and Armendariz contend there is no substantial evidence they committed the shooting "for the benefit of, at the direction of, or in association with" JT, within the meaning of former section 186.22, subdivision (b)(1).[11] Not so. A gang expert, presented with a hypothetical based on the facts of this case, opined that such a shooting would benefit the reputation of JT, even though only one of the four alleged shooters was a documented JT member. (See *People v. Albillar* (2010) 51 Cal.4th 47, 68 [section

---

[11] There is no dispute, for purposes of defendants' substantial evidence arguments, that JT was proven to be a "criminal street gang" under the law in effect at the time of trial.

35

186.22 gang enhancement "does not depend on membership in a gang at all"].) The expert described not only a general reputational benefit, but also the specific benefit tied to demonstrating that "murders against members of their gang . . . would not be tolerated." Among other things, Monzon's statements to Doe, describing the motive for the shooting as retaliation for the murders of Palomino (a JT member) and Pacheco (family to a JT member, though not himself gang-affiliated) by NSI members, ground this theory of benefit in actual, non-hypothetical facts. (*Cf. People v. Ochoa* (2009) 179 Cal.App.4th 650, 660, 662 [requiring "something more than an expert witness's unsubstantiated opinion" for first prong of gang enhancement analysis, namely, "specific evidentiary support"].) The jury reasonably inferred that Monzon did not keep his own motives secret from Lopez and Armendariz and that, by participating in the shooting, Monzon, Lopez and Armendariz demonstrated that they each intended the same benefit to JT. (See *People v. Garcia* (2016) 244 Cal.App.4th 1349, 1367 ["Committing a crime in concert with known gang members can be substantial evidence that the crime was committed in 'association' with a gang"].) Lopez's behavior at the cemetery, demonstrating animus to anyone with NSI connections, arguably supports the same inference.

Emphasizing their connections to the extended Palomino/Pacheco family, and their lack of formal ties to JT, Lopez and Armendariz argue that the evidence better supports the conclusion that "any beef the defendants had with NSI was personal—a family matter." This would have been a non-frivolous argument to make at trial, though

36

neither Armendariz nor Lopez did so.  Again, however, on substantial evidence review, this argument is misplaced.  Our question is whether the inferences the jury chose to make were supported by substantial evidence, not whether other inferences were arguably reasonable, too.  (See *Jones*, *supra*, 57 Cal.4th at p. 961.)  Similarly, as Armendariz and Lopez point out, the case in favor of the gang enhancement would have been stronger had there been evidence "typical" of such crimes, such as "gang colors, gang clothing, gang [accoutrements], gang signs, gang epithets, help by other gang members."  (*People v. Perez*, *supra*, 18 Cal.App.5th at p. 613-614.)  Our question, however, is whether there is substantial evidence to support the jury's decision, not whether the evidence could have been stronger.  (*Kurey*, *supra*, 88 Cal.App.4th at p. 848; *Jones*, *supra*, at p. 961.)

Malanche and Armendariz also argue that there is no substantial evidence in support of the second prong of the analysis, regarding specific intent to promote, further, or assist in criminal conduct by gang members.[12]  Again, not so.  It is undisputed that Monzon is a member of JT.  Above, we found substantial evidence to support the jury's findings that Malanche, Armendariz, and Lopez all participated in the shooting along with Monzon, and that each acted with premeditation and deliberation.  It follows that all of the defendants acted with the requisite specific intent for the second prong of the gang enhancement analysis.

---

[12]  Lopez conceded that there was "sufficient evidence that he had the specific intent to assist criminal conduct by a *member* of JT, i.e., Monzon," contesting only the first prong regarding intent to benefit the gang.

Malanche's argument to the contrary, joined by Armendariz, rests on the premises that (1) there is no evidence that they are JT members, or less formally associated with the gang, and (2) there is no direct evidence that they knew Monzon was a JT member. (Cf. *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 [defendant's commission of crime in association with another person he knows to be a fellow gang member supports the inference that he acted with the requisite specific intent].) As noted, whether or not Malanche and Armendariz were themselves gang members is not an element of the analysis. (*People v. Albillar*, *supra*, 51 Cal.4th at p. 68.) Moreover, there is ample circumstantial evidence from which the jury could reasonably infer that Malanche and Armendariz were well aware of Monzon's gang affiliation, and by extension the gang-related motivation for the shooting. Doe recalled Monzon referring to Malanche, as well as Lopez, as two "friends" of his who were shot. The jury may have concluded it was unlikely that Monzon kept his JT membership a secret from "friends." On the contrary, among other things, he advertises his affiliation through tattoos, including "a large JT on the backside of his neck" and the letters "VJT" behind one of his ears. There was evidence (albeit disputed by Malanche) that hours before Valdez's shooting in NSI territory, Malanche, along with Monzon and Lopez, attended a gathering at the gravesite of a JT casualty in the long-running conflict between JT and NSI. Armendariz was not at the gravesite but met up with Monzon and Lopez shortly afterwards, apparently at the residence of another JT gang member, before the three went on their drive together through NSI territory. The jury, it seems, found it implausible that either Armendariz or

38

Malanche were ignorant of Monzon's JT affiliation. Viewing the evidence in the light most favorable to the verdict, as we must, we find that interpretation of the circumstantial evidence to be entirely reasonable.

We conclude that, as to all defendants, the jury's true findings on the gang enhancement allegations were supported by substantial evidence.

7. *Firearms enhancements*

Lopez, Malanche, and Armendariz each challenge the sufficiency of the evidence for the vicarious liability firearm enhancement imposed against them (§ 12022.53, subd. (d) and (e)). Malanche and Armendariz also argue that there is no substantial evidence in support of their personal use firearm enhancements (§ 12022.53, subd. (c)). We find no merit in any of these contentions.

Section 12022.53 provides three different sentence enhancements for the personal use of a firearm in the commission of enumerated offenses: a 10-year enhancement for the personal use of a firearm (§ 12022.53, subd. (b)); a 20-year enhancement for the personal and intentional discharge of a firearm (§ 12022.53, subd. (c)); and a 25-year-to-life enhancement for the personal and intentional discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). Additionally, section 12022.53, subdivision (e)(1) "imposes vicarious liability under this section on aiders and abettors who commit crimes in participation of a criminal street gang." (*People v. Garcia* (2002) 28 Cal.4th 1166, 1171.) Thus, vicarious liability may be imposed if the defendant "violated subdivision (b) of Section 186.22" and "[a]ny principal in the offense

committed any act specified in [section 12022.53,] subdivision (b), (c), or (d)."
(§ 12022.53, subd. (e)(1); see also § 31 [defining "principal" to include both a direct perpetrator and an aider and abettor].)

For all defendants, the murder charge (count 1) was accompanied by firearms enhancement allegations under section 12022.53, subdivisions (c), (d), and (e). The prosecution ultimately chose not to proceed on a section 12022.53, subdivision (d), enhancement independently, conceding that it could not prove which of the defendants had personally fired the bullet that killed Valdez. Rather, the prosecution argued that defendants were *vicariously* liable for the subdivision (d) enhancement, per section 12022.53, subdivision (e)(1), because each of the four defendants were principals in the commission of the offense, the gang enhancement under section 186.22, subdivision (b) applied to all four, and one of the four (although it could not be established from the evidence which one) had personally fired the bullet that killed Valdez.[13]

Defendants' substantial evidence challenges to the jury's true findings on the vicarious liability firearms enhancements under section 12022.53, subdivisions (d) and (e), rest on arguments we have already rejected. We found above that evidence adequately supports the jury's findings that each of the defendants was liable for

---

[13] If an unidentified fifth or sixth person in either the Caprice or Sequoia with the four defendants had personally and intentionally fired the fatal bullet, the same reasoning would still apply. (See *People v. Garcia*, *supra*, 28 Cal.4th at p. 1174 ["Although the aider and abettor must first be convicted of the underlying offense before the enhancement may apply [citation], the prosecution need not plead and prove the *conviction* of the offense by the principal who intentionally and personally discharged a firearm"].)

premeditated murder, including its implicit rejection of defendants' friendly fire theory, as well as its true findings on gang enhancements under former section 186.22, subdivision (b). For the same reasons, the evidence also supports vicarious liability under section 12022.53, subdivisions (d) and (e).

We also find no lack of substantial evidence in support of the section 12022.53, subdivision (c) enhancements for personally using a firearm. As to Malanche, two firearms were found in the backpack Lopez tried to hide in bushes near the hospital, a .22 caliber pistol and a .38 caliber revolver. Unlike Lopez, whose fingerprints were found on the .22 caliber pistol, Malanche's fingerprints were not found on either of the two weapons. Nevertheless, there was circumstantial evidence connecting Malanche to the revolver, namely, the holster and live .38 caliber rounds found in his clothing. Notably, the revolver holds six rounds, and exactly six rounds were found in Malanche's clothing, arguably suggesting preparation for reloading, instead of the rounds finding their way there by accident, as Malanche has argued. The rounds loaded in the revolver were all expended, and forensics showed that the .38 caliber bullets recovered from the shooting scene came from that revolver. Monzon's reported comment that "everybody" started shooting at Valdez when he tried to retrieve a weapon from a car's trunk is reasonably interpreted to include Malanche. On substantial evidence review, such evidence is more than adequate to support the jury's finding, regardless of any arguments that might be marshalled in support of a different conclusion. (See *Jones*, *supra*, 57 Cal.4th at p. 961; *Kurey*, *supra*, 88 Cal.App.4th at pp. 848-849.)

41

Similarly, there is ample evidence to support the personal use firearm enhancement as to Armendariz. As discussed above, substantial evidence supports the conclusion that, during the shooting, he was driving the Sequoia later found in his garage. Further, surveillance video of the shooting showed that, when the Sequoia briefly stopped after passing Valdez's house, the driver's side door opened, and a flash of light arguably consistent with a muzzle flash can be seen through the driver's window, before the door closed and the Sequoia sped away. It was reasonable for the jury to conclude from this evidence alone that Armendariz personally fired at least one shot.[14]

Defendants have not demonstrated a lack of substantial evidence as to any of the firearms enhancements imposed.[15]

D. *Malanche's section 12022.53, subds. (d), (e) firearms enhancement*

Malanche contends that the trial court abused its discretion by declining to dismiss his vicarious liability firearms enhancement (§ 12022.53, subds. (d), (e)) in the interest of justice pursuant to section 1385. The argument is without merit.

A trial court "may, in the interest of justice pursuant to Section 1385 . . . strike or dismiss an enhancement otherwise required to be imposed by [section 12022.53]." (§ 12022.53, subd. (h).) A court's discretionary decision not to dismiss or strike a

---

[14] The prosecution introduced a variety of evidence aimed at demonstrating that the weapon Armendariz fired was a 30-30 caliber rifle. For present purposes, we need not delve into those details.

[15] For other reasons discussed below, however, we will vacate the firearms enhancements as to all defendants. (See Part II.M.3, *infra.*)

42

sentencing enhancement under section 1385 is "subject to review under the deferential abuse of discretion standard." (*People v. Carmony* (2004) 33 Cal.4th 367, 374.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at p. 377.)

We find nothing irrational or arbitrary in the trial court's decision. Malanche's argument rests largely on his view that he had only a "minor, ambiguous role" in Valdez's murder. The trial court was not compelled to accept that view of the evidence. The jury did not do so, as demonstrated by its verdict on Malanche's charges and their enhancements. As discussed above, those findings were supported by substantial evidence. The record also does not support Malanche's suggestion, based on the probation report, that the trial court failed to consider mitigating factors such as his "youth, lack of gang ties, and stable work and family history." On the contrary, the trial court expressly acknowledged Malanche's counsel's arguments to that effect, agreeing that it was a "complete waste and tragic" that someone with "his whole life ahead of him" would do what the jury found Malanche had done. The trial court just did not give those mitigating factors the weight Malanche would have preferred.

We also disagree with Malanche's suggestion that the trial court failed to give due weight to the public policies that underlie the relatively recent change in the law allowing trial courts the discretion to strike section 12022.53 enhancements in the interests of justice. Even after that expansion of the trial court's discretion, the same policy considerations that underpin the enhancements remain valid. (See, e.g., *People v.*

*Pearson* (2019) 38 Cal.App.5th 112, 117 [trial court must consider factors for determining whether to strike enhancements, general objectives in sentencing, and circumstances in aggravation and mitigation].)  It was up to the trial court to weigh conflicting policy imperatives and judge how they apply in this case.  We find nothing in the record showing either that the trial court misunderstood the scope of its discretion, or that it exercised that discretion in a manner that was irrational or arbitrary.

E.  *Evidence of Armendariz's admission to firearm possession*

Armendariz was charged in count 2 with violating section 29800, subdivision (a), based on the allegation that "on or about August 7, 2016" he possessed "a certain firearm, to wit, a handgun," while being a convicted felon.  Before trial, Armendariz pleaded guilty to that offense, agreeing on the plea form that he "did the things that are stated in the charges that I am admitting."  During the in-court plea process, the prosecutor asked Armendariz if it was true "that on August 7th, 2016, you were in possession of a firearm," to which Armendariz responded:  "Yes, sir."

During trial, the prosecution requested that the trial court inform the jury that Armendariz admitted possessing a firearm on August 7, 2016, by his guilty plea.[16]  Armendariz objected that his admission in connection with his plea lacked relevance and was unduly prejudicial.  The court rejected those arguments and read the following to the jury:  "Ladies and gentlemen, as part of the People's case in chief, I am informing you,

---

[16]  The prosecution also requested that the jury be informed of Lopez's admission to possessing a firearm but Lopez has not asserted any similar claim of error.

44

through what we call judicial notice, that on the date of January 24th of 2019, the defendant Mr. Armendariz admitted to being in possession of a firearm at some point [in] time on the date of August 7th of 2016.

Armendariz does not contest that, generally, a defendant's guilty plea is judicially noticeable. (See *People v. Lee* (2011) 51 Cal.4th 620, 650-651 (*Lee*).) Furthermore, when offered against himself, it also "falls within the hearsay rule exception for declarations against interest." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1321.) Nevertheless, "'judicial notice, since it is a substitute for proof [citation], is always confined to those matters which are relevant to the issue at hand.'" (*Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063.) In Armendariz's view, his admission to possessing a "firearm" on August 7, 2016 was irrelevant to count one and its enhancements, given that (1) the firearm in question was specified to be a "handgun" in the information; (2) Armendariz agreed, on his plea form, to the facts as "stated in the charges"; (3) the prosecution's theory of the case at trial was that Armendariz used a 30-30 rifle, not a handgun.

We decline to adopt Armendariz's reasoning.[17] A defendant's guilty plea is properly treated as an admission to the elements of the offense, but *only* those elements. (*People v. Saez* (2015) 237 Cal.App.4th 1177, 1206 [guilty plea "admits every element of the crime charged, but no more" (cleaned up)]; see *Descamps v. U.S.* (2013) 570 U.S.

---

[17] The People argue that Armendariz forfeited the argument by failing to object to the specific form of the trial court's statement to the jury. We decide the issue on the merits and decline to address the parties' arguments regarding forfeiture.

254, 270 (*Descamps*) ["when a defendant pleads guilty to a crime, he waives his right to a jury determination of only that offense's elements," no matter what the defendant "says, or fails to say, about superfluous facts"].) And for good reason: "A defendant, after all, often has little incentive to contest facts that are not elements of the charged offense— and may have good reason not to." (*Descamps*, *supra*, 570 U.S. at p. 270.) Even stipulating to a particular document, such as an information or complaint, as the factual basis for a plea does not admit facts beyond the elements of the charged offense. (*Saez*, *supra*, 237 Cal.App.4th at p. 1206; see also *People v. Gallardo* (2017) 4 Cal.5th 120, 139 fn. 6 ["questions about the proper characterization of a prior conviction are for a court to resolve, based on its evaluation of the facts *necessarily* encompassed by the guilty verdict or admitted by the defendant in pleading guilty to the prior crime" (italics added)].)

Armendariz's possession of a "firearm" was a necessary element of the offense to which he pleaded guilty, a violation of section 29800, subd. (a)(1). (See *People v. Clark* (2021) 62 Cal.App.5th 939, 958 [stating elements].) It is an element of the offense that the item at issue is a "real firearm," as opposed to a toy gun, pellet gun, or BB gun. (*Ibid.*) Whether the firearm is a handgun or a rifle, however, is legally insignificant. (*Ibid.*; see § 16520, subd. (a) [defining firearm as "a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion"].) Thus, it would have been improper for the trial court to take judicial notice of an admission by Armendariz that he had possessed a "handgun";

he made no such admission by means of his guilty plea. But the trial court properly instructed the jury that Armendariz admitted possessing a "firearm."

To be sure, the admission to possessing a "firearm" has a degree of ambiguity that an admission to a "handgun" would not. That does not, however, render Armendariz's admission irrelevant. Although the prosecution's theory was that he possessed and used a 30-30 rifle, Armendariz was free to argue that he did not possess that firearm.

In this regard, *Lee*, *supra*, 51 Cal.4th at p. 620, a case cited by Armendariz, is instructive. During the penalty phase of that capital murder trial, the prosecution sought to prove, as evidence in aggravation, that on a particular date in 1995 the defendant "either drove or rode as a passenger in a car that was driven rapidly into a yard where a family was having a barbecue," forcing them "to scatter to avoid being hit." (*Id.* at p. 649.) Three witnesses, including a Joseph Scruggs, testified about the incident, but none were able to identify the defendant as having been in the car. (*Ibid.*) At the prosecution's request, over defense objection, the trial court took judicial notice that in January 1996 the defendant had pleaded guilty to a misdemeanor assault charge, with the victim being Joseph Scruggs. (*Id.* at p. 650.) The trial court further instructed that the conviction itself was not to be treated as a factor in aggravation, but only offered "for the limited purpose of assisting you in determining the identity of the individual involved in" the incident "involving the car at the barbecue." (*Ibid.*) Our Supreme Court affirmed, even though the plea "said nothing about the identity of the car's driver," and in spite of the defendant's argument that the guilty plea showed only that he had "acquiesced in a

resolution of his criminal liability rather than taking the risk of going to trial." (*Id*. at p. 651.) Such arguments, the Court found, "go to the weight of the evidence, not its admissibility." (*Ibid.*) Similarly, here, Armendariz was free to argue (and he did in fact argue) that his admission to possessing a firearm on August 7, 2016 did not mean that he possessed and used a firearm during Valdez's shooting. But such arguments go to the weight of the evidence, not its admissibility.

We conclude that there was no error.

## F. *Prosecutorial Misconduct*

Defendants contend the prosecutor committed misconduct by commenting on their decisions not to testify. This argument was forfeited because none of the defendants timely objected. (See *People v. Fayed* (2020) 9 Cal.5th 147, 204 ["To preserve a claim of prosecutorial misconduct on appeal, "'a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety"'"].) Nevertheless, we address the claim on its merits. (See *People v. Williams* (2000) 78 Cal.App.4th 1118, 1126 (*Williams*) [addressing on appeal forfeited issue to "forestall a petition for writ of habeas corpus based on a claim of ineffectual counsel"].) We find no misconduct.

### 1. *Additional Background*

During part of closing arguments, the prosecutor focused on the 30 minutes before Valdez's murder, arguing that the evidence demonstrated that three of the defendants

48

spent that time "hunting . . . looking for anyone that fit the profile." The prosecutor continued the point as follows:

"And you heard all about that. And you heard there's no reason for them to be there. There's nothing, nothing in the evidence, zero, no facts to suggest that they were in the neighborhood of North Side Indio for any other purpose. There's nothing."

The prosecutor further commented as follows:

"All four of these [defense] attorneys are going to get up to speak to you, and they won't be able to give you an alternate explanation for why they're there because it's not in the evidence. And, remember, if it's not in the evidence, you can't rely on it. So what you have is 30 minutes of hunting, 30 minutes of looking for someone to murder.

"How do we know they wanted to murder that night?

"They're driving through the neighborhood where they're not supposed to be; rival gang member in the car.

"But the biggest factor of them all, the biggest factor of them all, they all have guns.

"For what?

"What other purpose are they looking for? Every single one of them has guns. And we're not talking one or two bullets in their guns, they are fully loaded, and they

have extra ammunition just in case.

"Why?

"Why?

"Because they're there to murder.  There's no alternate explanation.  You may hear about self-defense.  And we'll get into that.  We'll talk about that in a little bit.  You may hear that.  But you're not going to hear an alternate explanation for why they're there.

"And if they're there hunting, each with a gun fully loaded, with a rival gang member in their car, they are guilty of first degree, special circumstances murder.  And the facts are as simple as that."

Later in closing arguments, the prosecutor focused on evidence that three of the defendants drove past Valdez's house, briefly left NSI territory, and then returned:

"And the fact that can't be explained to you, this alternative theory besides the hunt, is why they passed the house the first time.  12:34, they go by it for the first time, and they return to commit murder.

"No alternate explanation based on the facts for that except they saw Adrian Valdez and his friends and they found their target.

"Only explanation.  Only explanation that you'll hear based on the facts."

In rebuttal argument, the prosecution made similar comments:

"They're all asking you to speculate.  In my entire argument that I made to you, I

50

never once said, 'maybe,' 'perhaps.' I gave you the evidence to support the argument.

"Each and every point that I gave you was based on the evidence. And I told you in my original argument that you would hear nothing, nothing about that 30 minutes and what else they could have been doing.

"And did you?

"Did any one of defense counsel address those 30 minutes of hunting?

"No. No. Because there's no evidence in the record to suggest they were doing anything but.

"So that's where your starting point is now. They were hunting. Nothing in the record suggests anything different.

"Yes, Andrew Malanche wasn't there yet. But Jose Armendariz, Angel Lopez, and Cesar Monzon were hunting for 30 minutes. And there's zero evidence in the record to suggest anything else."

Later in rebuttal argument, the prosecutor addressed defendants' arguments regarding self defense:

"There is no reasonable conclusion of all of the evidence that suggests self-defense, and that's all the defense has. They can't explain why else they were there; can't explain why they shifted cars; can't explain why they're fully loaded with guns.

And, therefore, they can't explain why it's not first degree, special circumstance murder."

2. *Analysis*

It is "well established" that *Griffin v. California* (1965) 380 U.S. 609 "prohibits reference to a defendant's failure to take the stand in his own defense." (*People v. Vargas* (1973) 9 Cal.3d 470, 475-476.) "'"*Griffin* forbids either direct or indirect comment"'"" on the defendant's decision not to testify. (*People v. Hughes* (2002) 27 Cal.4th 287, 372.) For example, a prosecutor "may commit *Griffin* error if he or she argues to the jury that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided *only* by the defendant, who therefore would be required to take the witness stand." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1339 (*Bradford*).) Nevertheless, a prosecutor is permitted "to comment on a defendant's failure to introduce material evidence or call logical witnesses." (*People v. Brown* (2003) 31 Cal.4th 518, 554; see *Bradford*, at p. 1340 [references to the "lack of *evidence*, which might have been presented in the form of physical evidence or testimony other than that of defendant" are permissible]; *People v. Ratliff* (1986) 41 Cal.3d 675, 690-691 (*Ratliff*) [pointing out defense failure to present exculpatory evidence, such as alibi testimony, is not *Griffin* error].) In the same vein, argument challenging defense counsel to provide a reasonable interpretation of the evidence consistent with the defendant's innocence is not impermissible comment on the defendant's decision not to testify.[18] (*People v. Stewart*

_____

[18] As Malanche notes, there is some federal appellate authority that finds argument couched in "how can he explain" to violate *Griffin*. (See *United States v. Cox* (1st Cir. 1985) 752 F.2d 741, 745 (*Cox*); *United States v. Skandier* (1st Cir. 1985) 758

*[footnote continued on next page]*

52

(2004) 33 Cal.4th 425, 505-506 (*Stewart*); *People v. Medina* (1995) 11 Cal.4th 694, 755-756 (*Medina*).)

Taken in context, the remarks here fall within the range of permissible commentary about the evidence. The prosecutor argued that the evidence supported only one reasonable inference, specifically, that defendants were deliberately "hunting" for someone to murder in the 30 minutes before Valdez's shooting. This argument tracks the prosecution's burden at trial regarding circumstantial evidence, that is, to persuade the jury that the only reasonable conclusion supported by the circumstantial evidence is guilt. (See *Jones*, *supra*, 57 Cal.4th at pp. 960-961 [noting "'duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations'"].) The prosecution challenged defense counsel to provide an interpretation of the evidence that reasonably supported any other conclusion, and asserted that the defense had failed to do so. Such arguments are permissible, *Griffin* notwithstanding. (*Bradford*, *supra*, 15 Cal.4th at p. 1340; *Stewart*, *supra*, 33 Cal.4th at pp. 505-506.)

In arguing for a different conclusion, defendants propose that they were capable of rebutting the prosecution's comments only by testifying, so the prosecutor's comments were the functional equivalent of commenting on their failure to testify. (See *Bradford*, *supra*, 15 Cal.4th at p. 1339.) Not so. Armendariz, in particular, who has argued he was

F.2d 43, 45; *United States v. Wilkins* (7th Cir. 1981) 659 F.2d 769, 774.) We are, however, bound to follow the reasoning of our Supreme Court, which has reached a different conclusion. (See *People v. Bradley* (1969) 1 Cal.3d 80, 86 ["we are not bound by the decisions of the lower federal courts even on federal questions"]; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

not even present for the shooting, was not precluded from producing alibi testimony from someone other than himself, if it existed. (See *Ratliff, supra*, 41 Cal.3d at pp. 690-691.) Any of the defendants could have, and in fact did, offer their own interpretations of the evidence, arguing their own points of view as to what reasonable inferences could and should be made about their clients' actions and states of mind.[19] And there is no logical reason why additional direct or circumstantial evidence of an alternative, innocent purpose for the defendant's foray into NSI territory would have to be in the form of their own testimony, as opposed to physical evidence or the testimony of others. (Cf., *People v. Murtishaw* (1981) 29 Cal.3d 733, 757, fn. 19 [prosecution comments emphasizing that testimony regarding statements made when only defendant and witness were present was "'uncontradicted'" constituted *Griffin* error]; *In re Rodriguez* (1981) 119 Cal.App.3d 457, 468 [prosecution comment that it was "'undisputed that there was a kidnap,'" arguably referring to defendant's failure to rebut testimony of incriminating statements by defendant, together with repeated admonitions reminding jury of the defendant's silence, constituted *Griffin* error].) The rule regarding prosecution commentary about evidence that could only be rebutted by the defendant's own testimony simply does not apply here.

---

[19] For example, Lopez's counsel contended that the shooting video and other evidence showed the Caprice driver was "surprised" when the Sequoia leading him made a U-turn, and that the physical evidence showed Lopez could only have "shot up in the air to try and scare people." Malanche's counsel argued that the circumstances were consistent with Malanche "thinking he's taking these guys to a party or somewhere. He's not thinking they're going to go into a shooting." Monzon's counsel focused his closing argument on the notion that the physical evidence showed Valdez to have been shot by "friendly fire," rather than by any of the defendants, and on attacking Jane Doe's testimony as uncorroborated accomplice testimony.

54

We find the challenged remarks to be permissible argument regarding the state of the evidence, rather than direct or indirect comment on defendants' decision not to testify. Because we find no *Griffin* error, we need not and do not address the parties' arguments regarding prejudice.

G. *Instructional Error*

Defendants, or some of them, claim that the jury instructions were erroneous in several respects. We find none of these claims persuasive.[20]

1. *Corroboration of accomplice testimony*

The parties disputed whether Jane Doe's testimony should be treated as that of an accomplice, or simply as that of a witness. Over the prosecution's objection, the trial court decided to "err on the side of giving" an instruction regarding accomplice testimony.

To that end, the court instructed based on CALCRIM No. 334, which is entitled "Accomplice Testimony Must Be Corroborated: Dispute Whether Witness Is Accomplice." The instruction required that, before considering Doe's statements or testimony, the jury had to decide whether she was an accomplice, and gave the standard for that determination. The instruction provided that, if the jury decided Doe was not an accomplice, "then supporting evidence is not required and you should evaluate her statements or testimony as you would that of any other witness." If it decided she was an

---

[20] Again, we exercise our discretion to address these claims on the merits, despite the lack of timely objections in the trial court. (*Williams*, *supra*, 78 Cal.App.4th at p. 1126.)

55

accomplice, however, then her statements or testimony could be used to convict the defendants only if "1. The accomplice's statement or testimony is supported by other evidence that you believe," "2. That supporting evidence is independent of the accomplice's statement or testimony," and "3. That supporting evidence tends to connect the defendant to the commission of the crime."

Separately, the jury was instructed with CALCRIM No. 104, defining "evidence" to include "the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I tell you to consider as evidence." It also received instruction, based on CALCRIM No. 318, on how to consider unsworn pretrial statements, allowing such evidence to "evaluate whether the witness's testimony in court is believable" and as "evidence that the information in that earlier statement is true."

On appeal, defendants do not argue that these instructions, taken individually, are incorrect statements of the law. Monzon (joined by Malanche) contends, however, that when put together the instructions effectively "permitted [jurors] to corroborate Doe's in-court testimony with (1) Monzon's pre-trial statements Doe testified to and (2) her own pre-trial statements." Understood in that light, the instructions would be incorrect, and in Monzon's view thereby violated state law and constitutional due process principles. (See *People v. Andrews* (1989) 49 Cal.3d 200, 214 ["an accomplice may not corroborate himself"].)

We are not persuaded. The instructions correctly required that the corroboration of Doe's testimony—to the extent necessary at all due to a finding that she was an

56

accomplice—be "independent" of her statement or testimony.  We find it implausible that the jury, so instructed, would believe Doe could corroborate herself as Monzon proposes.  It is not the most natural reading of the instructions, whether individually or as a whole, and in the trial court, no party suggested such a strained reading.  The trial court had no sua sponte duty to provide clarification of the concept of "independent" corroboration. (See *People v. Kimble* (1988) 44 Cal.3d 480, 503 ["because the trial court correctly instructed the jury. . .it was defendant's obligation to request any clarifying or amplifying instruction on that subject"].)

Because we find no merit in this instructional error claim, we have no need to address whether any error was harmless.  We will note, however, that the evidence tending to corroborate Doe's testimony—including, among other things, the GPS tracking evidence placing Monzon at the shooting scene, the bullet wounds suffered by Lopez and Malanche, for which they sought treatment shortly after the shooting, and the shot-up Sequoia found in Armendariz's garage—was far more substantial than the "slight" evidence of corroboration required for an accomplice's testimony.  We find no possibility, let alone likelihood, that some further elaboration on the concept of corroboration would have changed the jury's evaluation of Doe's testimony, nor the verdicts.

2. *CALCRIM No. 359 (Corpus Delicti:  Independent Evidence of a Charged Crime)*

Monzon, joined by Malanche, argues that, in the circumstances of this case, the version of CALCRIM No. 359 used at trial was erroneous because it "undercut the state's burden" of proving both the murder count and the degree of murder beyond a reasonable doubt.  We find no error.

The version of CALCRIM No. 359 used here was the following:

"A defendant may not be convicted of any crime based on his out-of-court statements alone.  You may rely on a defendant's out-of-court statements to convict him only if you first conclude that other evidence shows that the charged crime or a lesser included offense was committed.

"That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.

"This requirement of other evidence does not apply to proving the identity of the person who committed the crime and/or the degree of the crime.  If other evidence shows that the charged crime or a lesser included offense was committed, the identity of the person who committed it and the degree of the crime may be proved by a defendant's statements alone.

"You may not convict a defendant unless the People have proved his guilt beyond a reasonable doubt."[21]

The focus of defendants' argument is the third paragraph of the instruction. Monzon proposes that the jury could have interpreted the last sentence of that paragraph to mean that, so long as there is other evidence the charged murder was committed, the defendant's statements alone are sufficient evidence to carry the prosecution's burden of proof regarding the degree of the murder, no matter the contents of the statements. Monzon argues that his statements, as recounted by Doe, were actually insufficient, on their own, to prove the degree of the crime, so "[t]elling jurors they could nevertheless rely on [his] statements to infer the degree of this crime or the presence or absence of malice for a murder as opposed to a manslaughter conviction directly undercut the state's burden to prove the degree of these charges beyond a reasonable doubt."

Our question here is whether there was a reasonable likelihood the jury misapplied the instruction in the manner Monzon proposes. (*People v. Williams* (2013) 56 Cal.4th 630, 688-689.) The challenged instruction is not viewed in isolation but is considered in the context of the instructions as a whole. (*People v. Moore* (2011) 51 Cal.4th 1104, 1140.) Applying this standard, we find no merit in Monzon's claim of error.

First, even taken out of context, the instruction is not naturally read as Monzon proposes. The instruction states, in straightforward language, the correct statement of

---

[21] The version of CALCRIM No. 359 quoted by Monzon in briefing is not the version used in this case. The substance of his argument, however, applies to both versions.

law that the jury is *permitted* to use a category of evidence as proof of the degree of the crime, and that a defendant's statements alone "may" be sufficient evidence to prove the degree of a crime. (*See, e.g., People v. Rosales* (2014) 222 Cal.App.4th 1254, 1261.) The instruction does *not* state that any particular defendant's statements are, or are presumed to be, legally sufficient to prove the crime to be of one degree rather than another. And, although the prosecution emphasized the evidentiary importance of Monzon's statements, at no point did it argue or imply that Monzon's statements alone were sufficient to establish first degree murder. Particularly in the context of various other instructions describing the standard for finding a killing to be first degree murder, as opposed to a lesser offense or no offense at all, and this and other instructions emphasizing that it is the People's burden to prove the defendant's guilt beyond a reasonable doubt, it is implausible that the jury understood CALCRIM No. 359 in the manner Monzon proposes. And, again, in the absence of a request for clarification, the trial court was under no obligation to elaborate on the plain language of the instruction. (*People v. Kimble*, *supra*, 44 Cal.3d at p. 503.)

Monzon's reliance on *Francis v. Franklin* (1985) 471 U.S. 307 (*Francis*) is misplaced. *Francis* involved an instruction that set up a mandatory rebuttable presumption regarding intent, which was found to be an unconstitutional shifting of the burden of proof. (*Id.* at p. 316.) CALCRIM No. 359 describes a permissible finding, not a mandatory presumption. The reasoning of *Francis* is not applicable here.

We conclude that there was no instructional error regarding CALCRIM No. 359.

60

3. *CALCRIM No. 505 (Justifiable Homicide:  Self-Defense or Defense of Another)*

The trial court instructed the jury on self defense using, among other pattern instructions, CALCRIM No. 505.  Monzon, joined by Malanche, argues that a clause in that instruction misstates the law.  That clause is the italicized part of this sentence:  "Defendant's belief [in the need for self defense] must have been reasonable *and he must have acted only because of that belief.*" (Italics added)  According to defendants, the jury should not have been precluded from finding the killing justified if it found they acted based on mixed motives.  We find CALCRIM No. 505 correctly states the law.

By statute, a homicide is justifiable "when committed by any person . . . [¶] (1) When resisting any attempt to murder any person . . . or to do some great bodily injury upon any person . . . [¶] . . .(3) When committed in the lawful defense of such person . . . when there is reasonable ground to apprehend a design . . . to do some great bodily injury, and imminent danger of such design being accomplished . . . ."[22] (§ 197.)  "A bare fear of the commission of any of the offenses mentioned in subdivisions 2 and 3 of Section 197, to prevent which homicide may be lawfully committed, is not sufficient to justify it.  But the circumstances must be sufficient to excite the fears of a reasonable

---

[22] Other justifiable homicides, less relevant here, include "(2) When committed in defense of habitation, property or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous, or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein" and "(4) When necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed, or in lawfully suppressing any riot, or in lawfully keeping and preserving the peace." (§ 197.)

person, and the party killing must have acted under the influence of such fears alone."
(§ 198.)

The statutory language "such fears alone" does not permit adopting a rule that a homicide is justifiable in self-defense if the defendant's honest and reasonable fear for his life (or for the life of another) is only one of several factors motivating the killing, rather than the sole basis for the killing.  Such a rule would be inconsistent with more than a century of California case law holding that self-defense applies as a defense to murder only when the killing is motivated by fear alone, and not some other, more culpable motive.  (*People v. Trevino* (1988) 200 Cal.App.3d 874, 879 (*Trevino*) ["an instruction which states that the party killing must act under the influence of such fears alone, is a correct statement of the law"; accord, *People v. Hecker* (1895) 109 Cal. 451, 461 (*Hecker*); *People v. Ye Park* (1882) 62 Cal. 204, 207-208; Stats. 1850, ch. 99, § 30, p. 232 [to establish perfect self defense, "[i]t must appear that the circumstances were sufficient to excite the fears of a reasonable person, and that the party killing really acted under the influence of those fears, and not in a spirit of revenge"]; see *People v. Nguyen* (2015) 61 Cal.4th 1015, 1045 (*Nguyen*) [collecting cases].)  A person who "feels anger or even hatred toward the person killed" may nevertheless be justified in using deadly force in self-defense, but "the law requires that the party killing *act* out of fear alone." (*Trevino*, *supra*, at p. 879.)  Thus, "if the only causation of the killing was the reasonable fear that there was imminent danger of death or great bodily injury, then the use of deadly

force in self-defense is proper, regardless of what other emotions the party who kills may have been feeling but not acting upon." (*Ibid.*)

In *Nguyen*, our Supreme Court remarked in dicta that the defendant "did not argue . . . that the jury should have been instructed that acting based on mixed motives is permissible so long as reasonable fear was the but-for cause of his decision to kill." (*Nguyen*, *supra*, 61 Cal.4th at p. 1046.) The Supreme Court therefore had "no occasion to consider whether such a rule would be consistent with [prior interpretations of] section 198 . . . ." (*Ibid.*) Monzon asks that we interpret section 198 to permit a defendant to claim self-defense despite having such mixed motives in this sense, and that we find on this basis that the jury's instructions on self-defense were erroneous. We instead will follow the holdings of *Nguyen* and *Trevino*. Self-defense is not available to a defendant who does not "act on the basis of fear alone but also on a desire to kill [the victim]." (*Nguyen*, at p. 1044; see also *Trevino*, *supra*, 200 Cal.App.3d at p. 879 ["The party killing is not precluded from feeling anger or other emotions save and except fear; however, those other emotions cannot be causal factors in his decision to use deadly force. If they are, the homicide cannot be justified on a theory of self-defense"].)

Monzon notes that the first sentence of section 198 makes specific reference only to section 197, subdivisions (2) and (3), and not subdivision (1). On that basis, he proposes that "when the evidence indicates that the defendant was afraid a crime was about to occur, the law insists that the defendant's fear be reasonable and that he act solely based on that fear," but "when the evidence indicates that a defendant acted in self

defense while resisting an attempt to kill or cause great bodily injury, that is the end of the inquiry; there is no further limit on the right to use self-defense." This argument, however, is incompatible with the reasoning of *Nguyen*. (See *Nguyen*, *supra*, 61 Cal.4th at p. 1044-1045 [citing § 197, subdivisions (1) and (2), along with section 198, in discussing the law of perfect self-defense].) Our Supreme Court has also, prior to *Nguyen*, interpreted section 198 to apply to circumstances described in section 197, subdivision (1). (See *People v. Randle* (2005) 35 Cal.4th 987, 998-999, overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1201 [reasonable person standard of § 198 applies to § 197, subd. (1)].)

Monzon devotes a portion of his briefing to arguing that CALJIC pattern jury instructions reflect his view of the law, and that CALJIC No. No. 5.10, in particular, "accurately conveys the substance" of section 197, subdivision (1). Of course, pattern jury instructions are not legal authority. Moreover, he does not attempt to grapple with caselaw criticizing CALJIC No. 5.10 as "surplusage" that "added nothing to the other instructions, and should not have been given" where the jury received other self-defense instructions, including CALJIC No. No. 5.12, which expressly incorporates the limitations of section 198. (*People v. Barillas* (1996) 49 Cal.App.4th 1012, 1022, 1023.)

Monzon also is incorrect to suggest that *People v. Young* (1963) 214 Cal.App.2d 641 (*Young*) supports his reading of sections 197 and 198. In that case, the erroneously excluded jury instructions included predecessor versions of both CALJIC No. 5.10 *and* 5.12, the latter of which incorporates the limitations found in section 198, i.e., that one's

64

fear must be reasonable and the sole motivation for the killing. (*Young*, *supra*, 214 Cal.App.2d at p. 644, fn.2.) *Young* does not stand for the proposition that a jury may properly be instructed on CALJIC No. 5.10, or another instruction reflecting principles derived only from section 197, subdivision (1), without an additional instruction reflecting section 198.

CALCRIM No. 505 correctly states the law, and the trial court did not err in instructing the jury with it.

4. *CALCRIM No. 3471 (Self Defense: Mutual Combat or Initial Aggressor)*

The trial court instructed the jury on mutual combat or acting as an initial aggressor as a limitation on self-defense using CALCRIM No. 3471.[23] Malanche, joined by Armendariz, contends that the instruction "was not supported by substantial evidence

---

[23] The instruction, as given, was the following:

"A person who engages in mutual combat or who starts a fight has a right to self-defense only if:

"1. He actually and in good faith tried to stop fighting;
"AND
"2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting;
"AND
"3. He gave his opponent a chance to stop fighting.

"If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.

"However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to stop fighting, or communicate the desire to stop the opponent, or give the opponent a chance to stop fighting.

"A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

65

and should not have been given." Monzon concedes that there was substantial evidence to justify the instruction, but argues that the instruction was "fundamentally incorrect." We find no error.

First, there was ample evidence to justify instructing with CALCRIM No. 3471. A reasonable fact finder could have concluded from the video of the shooting, among other evidence, that defendants and Valdez's group began shooting at one another close to simultaneously. Arguably, this circumstance could be understood to suggest an implicit agreement to engage in mutual combat; in a matter of seconds, they saw each other, recognized each other as enemies, and opened fire. Alternatively, the jury could have concluded that the circumstances showed that defendants initiated a fight by repeatedly driving past Valdez's group, thereby displaying their presence on NSI territory. In the context of the conflict between NSI and JT, a challenge and an implicit threat of some level of imminent force is, at least arguably, expressed by such behavior. The fact finder could have concluded, however, that it was Valdez's group that suddenly escalated the confrontation to one involving deadly force. For each of these reasons, it was appropriate to instruct the jury on the law of self defense in the context of mutual combat or where the defendant was the initial aggressor, but using only non-deadly force.

Further, we find no error in the pattern instructive given by the court. Monzon contends the italicized portion of the instruction is erroneous: "[I]f the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that *the defendant could not withdraw from the fight*, then the defendant had the right to

66

defend himself with deadly force..." (Italics added)  He contends the trial court should have added the words "in safety" after the word "withdraw," so that it would read "...could not withdraw in safety from the fight...."  Monzon proposes that since he was in a car, "the answer to the question as presented . . . was a foregone conclusion—of course he could have retreated."  In his view, the correct, "more nuanced" question would have been whether he could withdraw *in safety*.  He argues that on the facts of the case, "involving two people in the car being actually hit by gunfire and one car riddled with bullets, jurors could reasonably find the answer was no, and that self-defense was therefore available."

This argument fails for several reasons.  First, our Supreme Court and the Court of Appeal have long used the term "withdraw" in this context interchangeably with retreating or withdrawing "in safety" or "with safety."  In *Hecker*, *supra*, 109 Cal. at p. 461, the Supreme Court articulated the point in the manner later used in CALCRIM No. 3471, describing the defendant's use of deadly force as justified where the defendant, even though the initial aggressor with non-deadly force, "was put in such sudden jeopardy by the acts of the deceased that he *could not withdraw*, and if it was thus that [the victim] met his death." (Italics added.)  The *Hecker* court later restated the same point, but using the phrase "retreat with safety."  (*Id.* at p. 464.)  In *People v. Sawyer* (1967) 256 Cal.App.2d 66, the Court of Appeal approved an instruction using the term "withdraw" alone.  (*Id.* at p. 75, fn. 2.)  In *People v. Gleghorn* (1987) 193 Cal.App.3d 196, the Court of Appeal, citing *Sawyer*, similarly stated the rule:  "However, when the

67

victim of simple assault responds in a sudden and deadly counter assault the original aggressor *need not attempt to withdraw* and may use reasonably necessary force in self-defense." (*People v. Gleghorn*, *supra*, 193 Cal.App.3d. at p. 201 (Italics added).)  The instruction given to the jury in *Gleghorn*, however, had used the phrase "retreat with safety."  (*Ibid*.)  In *People v. Quach* (2004) 116 Cal.App.4th 294, the court discussed with approval all of this case law, describing it as addressing a repeated issue in "virtually identical fashion."  (*Id.* at p. 302.)

The bottom line, in our view, is that the aspect of self-defense at issue here is adequately conveyed by CALCRIM No. 3471 as given by the trial court.  The concept of withdrawing from a fight in the face of a sudden, deadly counterattack necessarily implies that the one seeking to withdraw be able to do so without harm, so the instruction is correct with or without the additional gloss of "in safety."  Assuming an arguable ambiguity, we find no reasonable likelihood that jurors would construe the instruction in the manner Monzon proposes, to deny the defense to an initial aggressor who used only nondeadly force, even if retreat would leave him in danger of a deadly counterattack.

Defendants have demonstrated no error as to the instruction based on CALCRIM No. 3471, which was appropriate to give on the facts and which correctly stated the law.

H.  *Verdict Form*

Armendariz asserts, joined by Lopez and Malanche, that the verdict forms for the firearms enhancements under section 12022.53, subdivisions (d) and (e) were erroneous. The prosecution sought to hold defendants liable for a subdivision (d) enhancement only

indirectly, via the vicarious liability provision of subdivision (e)(1). The verdict forms cited to subdivisions (d) and (e), but they did not recite the statutory vicarious liability language: "Further, we find the defendant . . . in the commission of the offense charged under count 1 of the Information did, personally and intentionally discharge a firearm and proximately caused great bodily injury and death to another person, not an accomplice within the meaning of Penal Code section 12022.53, subdivision (d) and (e)." The jury returned true findings as to each of the four defendants on this enhancement. Nevertheless, according to defendants, the lack of vicarious liability language on the verdict form means that the jury made no vicarious liability finding, so there is no basis to impose any vicarious liability firearms enhancement against them. We find no merit in this argument.

Armendariz, Lopez, and Malanche waived any claim of error regarding the verdict form by failing to raise a specific objection in the trial court. (*People v. Johnson* (2015) 61 Cal.4th 734, 784 (*Johnson*).) At no point did any defendant object to the verdict form, nor did any of them seek clarification when the court polled the jury concerning its verdict. In this context, enforcement of the requirement of imposing a timely objection is particularly crucial. (*Ibid.*; see *Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 270 [without a timely objection, "a court cannot avoid or cure the defect: after the jury's discharge, the court can neither complete the polling nor return the jury to its deliberations"]; *People v. Kennedy* (2005) 36 Cal.4th 595, 612 ["the forfeiture rule ensures that the opposing party is given an opportunity to address the objection, and it

prevents a party from engaging in gamesmanship by choosing not to object, awaiting the outcome, and then claiming error"].)

In any event, however, there was no prejudice to defendants from any defect in the verdict form. (See *Johnson*, *supra*, 61 Cal.4th at p. 785 ["""[T]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice"""].) The jury was properly instructed on the single theory of liability for the section 12022.53, subdivision (d) enhancement that was asserted by the prosecution, namely, via the vicarious liability provisions of subdivision (e)(1). In closing argument, the People walked the jury through the instruction and the verdict form, explaining the concept of vicarious liability with specific reference to the applicable subdivisions of section 12022.53. Moreover, in the circumstances of this case, the jury's true findings regarding the vicarious liability firearms enhancement follow inevitably from its guilty verdicts on count 1 (demonstrating its implicit rejection of the defendants' friendly fire theory) and the section 186.22 gang enhancements. Thus, we find the jury's intent to make the requisite findings for the vicarious liability firearms enhancement unmistakably clear. Even if defendants' arguments as to omitted language were not waived for lack of specific objection, they would not justify reversal.

I. *Cruel and Unusual Punishment*

Malanche argues that his sentence of life without the possibility of parole plus a consecutive term of 25 years to life constitutes cruel and unusual punishment, prohibited by the United States and California Constitutions. We are not persuaded.

The Eighth Amendment to the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." (U.S. Const., 8th Amend.) Similarly, the California Constitution provides: "Cruel or unusual punishment may not be inflicted or excessive fines imposed." (Cal. Const., art. I, § 17.)

In *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*), the United States Supreme Court acknowledged that "children are constitutionally different from adults for purposes of sentencing," as juveniles have diminished capacity and greater prospects for reform than adults. (*Id.* at p. 471-472.) On that basis, it found "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." (*Id.* at p. 479.) Our Supreme Court has applied this principle in *People v. Franklin* (2016) 63 Cal.4th 261, among other cases, holding that "juvenile homicide offenders may not be sentenced to the functional equivalent of life without parole . . . without certain protections afforded by the Eighth Amendment as interpreted in [*Miller*]." (*People v. Contreras* (2018) 4 Cal.5th 349, 359.)

Malanche is not a juvenile offender, as he was 25 years old when Valdez was shot. Rather, he contends that "the same transitory characteristics of youth which make a

71

mandatory life-without-parole sentence unconstitutional for juveniles continue past the age of eighteen and into the twenties." He urges us to conclude that the "hallmark characteristics of youth which make sentences of life without the possibility of parole unconstitutionally cruel and unusual as to the vast majority of juveniles apply equally to a 25-year-old" like him.

As Malanche acknowledges, however, several California cases have rejected similar arguments because "[o]ur nation's, and our state's, highest court have concluded 18 years old is the bright-line rule and we are bound by their holdings." (*People v. Perez* (2016) 3 Cal.App.5th 612, 617 [rejecting claim by 20-year-old offender]; accord *People v. Abundio* (2013) 221 Cal.App.4th 1211, 1220-1221 [18-year-old offender]; *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482 [18-year-old offender].) We find no good reason to reach a different conclusion. (See *People v. Bradley* (1969) 1 Cal.3d 80, 86 [Court of Appeal bound by Supreme Court of United States on federal law matters]; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [Court of Appeal bound by California Supreme Court precedent]; *People v. Gipson* (2013) 213 Cal.App.4th 1523, 1529 [in the absence of "good reason to disagree," we "typically follow the decisions of other appellate districts or divisions"].)

Malanche further argues that his sentence is "grossly disproportionate to his individual moral culpability, considering all the circumstances of this case." Again, however, this argument rests primarily on his relative youth. He also emphasizes other mitigating factors, such as his "lack of gang ties, and stable work and family history," and

what he describes as his "minor, ambiguous role" in the murder. He fails, however, to address most of the factors that either federal or California law identify to determine whether a non-capital sentence is cruel and unusual. (See *Graham v. Florida* (2010) 560 U.S. 48, 59-60 [discussing Eighth Amendment analysis for "term-of-years sentences"]; *In re Lynch* (1972) 8 Cal.3d 410, 425 [describing "three-pronged test" for claims of cruel and unusual punishment under the California Constitution].) We construe Malanche's failure to discuss these factors as a concession that they do not weigh in his favor.

Moreover, Malanche cites no appellate authority, from any jurisdiction, holding a sentence of life without the possibility of parole to be unconstitutionally cruel and unusual as to an adult convicted of first-degree murder. The only case he cites that so holds is an order from the United States District Court for the District of Connecticut, granting habeas relief to a defendant who was eighteen at the time of the offense. (*Cruz v. United States* (D.Conn. Mar. 29, 2018, No. 11-CV-787 (JCH)) 2018 U.S.Dist.LEXIS 52924 (*Cruz*).) Malanche fails to note in briefing that *Cruz* was reversed by the Second Circuit Court of Appeals, which found the order inconsistent with both its own prior binding authority and United States Supreme Court precedent. (*Cruz v. United States* (2d Cir. 2020) 826 F.App'x 49, 52.) We need not discuss the issue in any further detail, except to note that we find the Second Circuit's analysis persuasive.

Malanche has not demonstrated that his sentence constitutes cruel and unusual punishment under either the United States Constitution or the California Constitution.

73

J. *Senate Bill No. 1393*

Monzon and Armendariz argue that the trial court misunderstood the scope of its sentencing discretion, failing to recognize the changes enacted by Senate Bill No. 1393 (2017-2018 Reg. Sess.) (Senate Bill 1393). Their argument is based on the trial court's lack of express comment on its decision not to strike their prior serious felony conviction enhancements, even though it did comment on its decision not to strike firearm enhancements. They infer that the trial court did not know it had the discretion to strike the prior serious felony conviction enhancements. Even assuming the trial court misunderstood the scope of its discretion, however, there is no doubt as to how the trial court would have exercised that discretion.

Effective January 1, 2019, Senate Bill 1393 amended sections 667, subdivision (a), and 1385, subdivision (b), to allow a court, in its discretion, to strike or dismiss a prior serious felony conviction for sentencing purposes. (Stats. 2018, ch. 1013, §§ 1-2.) Under the versions of these statutes in effect prior to January 1, 2019, the court was required to impose a five-year consecutive term for "any person convicted of a serious felony" (former § 667, subd. (a)), and the court had no discretion "to strike any prior conviction of a serious felony for purposes of enhancement of a sentence under Section 667 (former § 1385, subd. (b)).

Senate Bill 1393 had been in effect for months when defendants were sentenced on June 17, 2019. On a silent record, we must presume that the trial court is aware of the applicable law; "we cannot presume error where the record does not establish on its face

74

that the trial court misunderstood the scope of [its] discretion." (*People v. Gutierrez* (2009) 174 Cal.App.4th 525, 527.) Where the record is ambiguous as to whether the court understood the scope of its discretionary powers, remand may be appropriate. (*People v. Ochoa* (2020) 53 Cal.App.5th 841, 853-854.)

It is questionable, at best, whether defendants have identified any ambiguity in the record as to whether the trial court understood the scope of its discretion under Senate Bill 1293. Nevertheless, we will not spill much ink on the issue. For other reasons we discuss below, defendants will need to be resentenced. We trust that when the trial court does so, it will exercise its discretion as appropriate in light of current law.

K. *Cumulative Error*

Lopez, Malanche, and Armendariz each argue that they are entitled to reversal because of cumulative errors. We have not found a series of trial errors to be individually harmless. The cumulative error doctrine does not apply.

L. *Senate Bill No. 136*

The parties agree that under section 667.5, subdivision (b), as amended by Senate Bill No. 136 (Stats. 2019, ch. 590, § 1), the prison prior enhancements imposed on Monzon and Armendariz should be stricken. The parties are correct. Under section 667.5, subdivision (b) as amended, such enhancements may only be imposed for certain sexually violent offenses. Monzon's and Armendariz's prior prison sentences were not for such offenses. Furthermore, although Senate Bill No. 136 did not become effective until January 1, 2020, the change in law applies retroactively to cases not yet final. (See

75

*People v. Lopez* (2019) 42 Cal.App.5th 337, 341; *In re Estrada* (1965) 63 Cal.2d 740, 748.) Accordingly, those enhancements must be stricken.

M. *Assembly Bill No. 333*

After briefing was completed, on our own motion, we directed the parties to file supplemental briefing addressing the effect of the statutory changes made by Assembly Bill 333 on this appeal. We received supplemental briefs as requested from the parties, as well as an unsolicited brief from an amicus. We separate our discussion into three sections, each addressing a different aspect of Assembly Bill 333's changes to the law.

1. *Bifurcation of Gang Enhancement Allegations*

Assembly Bill 333 added section 1109 to the Penal Code. As relevant here, under section 1109, in a case where a gang enhancement finding is alleged, the defense may demand a bifurcated trial such that "[t]he question of the defendant's guilt of the underlying offense shall be . . . determined" before any "further proceedings to the trier of fact on the question of the truth of the enhancement." (§ 1109, subd. (a)(1)-(2).)

The parties dispute whether section 1109 is retroactive, so that it would apply to judgments, like defendants', that were not yet final when Assembly Bill 333 took effect.[24] California courts are split on the issue. (*People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128-1131 (*Ramos*) [finding § 1109 is retroactive]; *People v. Burgos* (2022) 77

---

[24] More precisely, Armendariz, Lopez, and Malanche argue that section 1109 is retroactive, and requires reversal of the judgments against them in their entirety. Monzon does not discuss section 1109 at all. The People address section 1109 only in a footnote, taking the position that section 1109 is "not relevant to this case," and that section 1109 "would appear to apply prospectively only."

76

Cal.App.5th 550, 564-568 (*Burgos*) [same]; *People v. Montano* (2022) 80 Cal.App.5th 82, 105-108 (*Montano*) [same]; *People v. Perez* (2022) 78 Cal.App.5th 192, 207 [finding § 1109 is not retroactive]; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65 [same].) The justices of this court have not come to a consensus on the issue. (Compare *People v. Boukes* (September 29, 2022) 2022 Cal.App.Lexis 826 [holding § 1109 is not retroactive] with *id.* (J. Slough concurring) [would hold § 1109 retroactive, but find error harmless].)

We need not resolve this question. Even assuming that section 1109 applies retroactively, we find the failure to bifurcate the gang enhancements did not result in a miscarriage of justice and would be harmless as to the underlying convictions. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1208 [declining to resolve split in authority but holding failure to bifurcate gang enhancement under § 1109 was harmless as to underlying conviction under standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836].) Virtually all, if not all, of the gang-related evidence introduced at trial was relevant to establish issues such as motive and intent. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 [observing that "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime"].) By itself, a tendency to show defendants' possible connections to gangs does not justify the exclusion of evidence during the first

77

phase of trial. (See *Ramos*, *supra*, 77 Cal.App.5th at p. 1132 ["nothing in Assembly Bill 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges"].) We find no reasonable probability that defendants would have obtained a more favorable result if their trials had been bifurcated, so section 1109 does not warrant reversal here.

2. *Constitutionality*

Under section 190.2, subdivision (a)(22), the punishment for first degree murder is death or life without the possibility of parole if "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." Assembly Bill 333 did not directly modify section 190.2, but it did modify several concepts incorporated into that statute.

Specifically, Assembly Bill 333 narrowed the definition of "criminal street gang." What was previously defined as an "ongoing *organization, association, or group* of three or more persons . . . whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity" (former § 186.22, subd. (f), italics added) is now defined as an "ongoing, *organized association or group* of three or more persons . . . whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity" (§ 186.22, subd. (f), italics added). Assembly Bill 333 also raised the bar for proving the "pattern of criminal gang activity" needed to establish a criminal street gang, as: (1) predicate offenses now must be proven to have "commonly benefitted

78

a criminal street gang, and the common benefit of the offense[s] is more than reputational"; (2) the last predicate offense must have occurred within three years of the currently charged offense; (3) the predicate offenses must have been committed by two or more "members" of the gang, as opposed to any persons; (4) the currently charged offense no longer counts as a predicate offense; and (5) the list of qualifying predicate offenses is shortened.  (Assem. Bill 333, § 3, revised § 186.22, subd. (e)(1)-(2).)

The People contend that Assembly Bill 333's amendments to section 186.22, subdivisions (e) and (f), are invalid as applied to section 190.2, subdivision (a)(22) special circumstances.  The gang murder special circumstance was enacted in 2000 as part of the voter initiative Proposition 21.  (*People v. Shabazz* (2006) 38 Cal.4th 55, 65.) Proposition 21 provided that its provisions could not be amended by the Legislature except by a two-thirds vote of each house, or a statute that becomes effective only when approved by the voters.  (Prop. 21, § 39.)  "Assembly Bill 33 satisfies neither requirement.  Thus, if Assembly Bill 333 amended Proposition 21 at all, it violates the Constitution."  (*People v. Rojas* (2022) 80 Cal.App.5th 542, 553 (*Rojas*); see *Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1251 [under Cal. Const., art. II, § 10, subd. (c), voters' power to decide whether or not Legislature can amend or repeal initiative statutes is "absolute"].)  Amicus California District Attorneys Association ask that we hold Assembly Bill 333 to be an unconstitutional amendment of Proposition 21 not only as applied to section 190.2, subdivision (a)(22) special circumstances, but also to section 186.22 subdivision (b)(1) gang enhancements.

There is a split of authority on the constitutionality of Assembly Bill 333 as applied to section 190.2, subdivision (a)(22). In *Rojas*, *supra*, 80 Cal.App.5th at p. 542, a majority of the panel held that "Assembly Bill 333 'takes away' from the scope of conduct that Proposition 21 made punishable under section 190.2" (*id.* at p. 555), so it is "unconstitutional to the extent it would amend that initiative" (*id.* at p. 557). The *Rojas* majority found the "appropriate remedy is not to void Assembly Bill 333 in its entirety, but rather to disallow this unconstitutional application of Assembly Bill 333." (*Id*. at p. 557-558.) Thus, "[i]n practical effect, *Rojas* holds that a special circumstance murder allegation under section 190.2(a)(22) may be proven based on a different, less restrictive definition of a 'criminal street gang' than is found in the current version of section 186.22." (*People v. Lopez* (022) 82 Cal.App.5th 1, 15. (*Lopez*).)

The court in *People v. Lee* (2022) 81 Cal.App.5th 232 (*Lee*) reached a different conclusion, holding that Assembly Bill 333 did not unconstitutionally amend section 190.2, subdivision (a)(22). And in *Lopez*, the court of appeal followed and expanded on *Lee*'s reasoning in holding that "Assembly Bill 333's amendments to section 186.22, subdivisions (e) and (f) lawfully apply to section 182.5," another statute which expressly incorporates aspects of section 186.22. (*Lopez*, *supra*, 82 Cal.App.5th at p. 25.) Both *Lee* and *Lopez* focus on the question of voter intent, analyzing whether in enacting Proposition 21 the voters intended to "'impose a time-specific incorporation'" of section 186.22, and concluding that they did not. (*Lopez*, *supra*,, at p. 15, quoting *Lee*, *supra*, 81 Cal.App.5th at p. 245.)

We find *Lee* and *Lopez* more persuasive than *Rojas*, and we adopt their reasoning as our own.  In particular, we note that section 186.22 took effect in 1988, long before Proposition 21 was passed.  (*Lopez*, *supra*, 82 Cal.App.5th at p. 16; Lee, *supra*, 81 Cal.App.5th at p. 242.)  In Proposition 21, the electorate demonstrated that it "knew how to express the intent to freeze a statutory definition," that is, to incorporate the statute specifically as it already existed on the date Proposition 21 became effective and without regard to any later amendments.  (*Lee*, *supra*, 81 Cal.App.5th at p. 243; see *Lopez,supra*, at p. 24.)  Proposition 21 did exactly that for several amendments to the Three Strikes law.[25]  But the voters inserted no similar language to section 190.2 or section 186.22.  "'When the Legislature "has employed a term or phrase in one place and excluded it in another, it should not be implied where excluded."'"  (*Lopez*, at p. 25, quoting *Pasadena Police Officers Assn. v. City of Pasadena* (1990) 51 Cal.3d 564, 576; see also *Lopez*, at p. 25, quoting *People v. Briceno* (2004) 34 Cal.4th 451, 459 ["'"In interpreting a voter initiative . . . we apply the same principles that govern statutory construction"'"].)

---

[25]  For example, "Proposition 21 added section 667.1 to the Penal Code to read: 'Notwithstanding subdivision (h) of Section 667, for all offenses committed on or after the effective date of this act, all references to existing statutes in subdivisions (c) to (g), inclusive, of Section 667, are to those statutes *as they existed on the effective date of this act*, including amendments made to those statutes by this act." (*Lopez*, *supra*, 82 Cal.App.5th at p. 24.)  Similarly, Proposition 21 added section 1170.125, which reads: "'Notwithstanding Section 2 of Proposition 184, as adopted at the November 8, 1994 General Election, for all offenses committed on or after the effective date of this act, *all references to existing statutes in Section 1170.12 are to those statutes as they existed on the effective date of this act*, including amendments made to those statutes by this act.'" (*Lopez*, at p. 24.)

We find nothing in the statutory language, nor anywhere else, suggesting that the voters who enacted Proposition 21 intended to freeze section 186.22, subdivisions (e) and (f) in the version that existed when Proposition 21 was enacted. As such, Assembly Bill 333's changes to section 186.22, subdivisions (e) and (f) are not unconstitutional amendments Proposition 21. Rather, those changes lawfully apply to both section 190.2, subdivision (a)(22) and section 186.22.

3. *Application*

Having concluded that Assembly Bill 333 is constitutional as applied to both section 190.2, subd. (a)(22) section 186.22, we turn to how the changes in the law apply in this case.

To start, aside from the constitutionality argument we have already addressed, the People concede the changes to section 186.22 enacted by Assembly Bill 333 retroactively apply to all defendants whose judgments are not yet final on appeal. We agree. To our knowledge, no court has disagreed, as there is nothing in Assembly Bill 333 that might be interpreted to rebut the inference of retroactivity that applies to "ameliorative statutes." (*People v. Frahs* (2020) 9 Cal.5th 618, 634; see, e.g., *People v. Lopez* (2021) 73 Cal.App.5th 327, 343-344.)

The parties also agree, as do we, that the jury's verdicts may be upheld, Assembly Bill 333 notwithstanding, if the deficiencies in the jury's instructions (as viewed in light of the changes to the law) are harmless under the standard articulated in *Chapman v. California* (1967) 376 U.S. 18, 24. (*People v. Sek* (2022) 74 Cal.App.5th 657, 668 (*Sek*).)

"Under the *Chapman* standard, reversal is required unless 'it appears beyond a reasonable doubt that the error did not contribute to th[e] jury's verdict.'" (*Sek*, *supra*, 74 Cal.App.5th at p. 668.) "[T]o prove harmless error under the *Chapman* standard, it is not enough to show that substantial or strong evidence existed to support a conviction under the correct instructions." (*People v. E.H.* (2022) 75 Cal.App.5th 467, 479 (*E.H.*).) "The inquiry 'is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.'" (*Ibid.*)

The parties disagree as to whether that harmless error standard is satisfied. We conclude the defendants have the better side of the dispute; we do not find that the deficiencies in the jury's instructions harmless beyond a reasonable doubt. Among other things, the jury was not instructed that to find the section 186.22, subdivision (b)(1) allegations true, it had to find that the benefit to the gang from both the current offenses and the predicate offenses was more than reputational, as is now required. (§ 186.22, subds. (e)(1), (g).) The People may well be correct that there is "ample evidence" presented to support the jury reaching the same conclusions as it did, even under the current law. Nevertheless, the jury could have rejected the People's view of the evidence. Moreover, defendants did not previously have any incentive or opportunity to present evidence or argument disputing the issue, particularly as to the predicate offenses. Because "we cannot rule out the possibility that the jury relied on reputational benefit to the gang as its basis for finding the enhancements true" (*Sek*, *supra*, 74 Cal.App.5th at p.

83

669) and because the record does not compel the conclusion that "the guilty verdict actually rendered in *this* trial was surely unattributable to the error" (*E.H.*, *supra*, 75 Cal.App.5th at p. 479), reversal of the affected portions of the jury's verdicts is required.

The proper remedy under these circumstances—when "newly required elements were 'never tried' to the jury" and the jury was allowed to make findings on grounds that are no longer permissible—"is to remand and give the People an opportunity to retry the affected charges." (*E.H.*, *supra*, 75 Cal.App.5th at p. 480.) Thus, the jury's true findings on the gang enhancements (§ 186.22, subd. (b)(1)) found true as to all defendants must be vacated. It follows that the vicarious liability firearm enhancements (§§ 12022.53, subds. (d), (e)) found true as to all defendants and the section 190.2, subdivision (a)(22) gang-murder special circumstance found true as to Monzon, which were based on those section 186.22 findings, must also be vacated. We will remand "to give the People the opportunity to prove the applicability of the enhancements [and special circumstance] under the amendments to section 186.22." (*People v. Lopez*, *supra*, 73 Cal.App.5th at p. 346.) After that limited retrial, or if the People elect not to retry these allegations, the trial court will resentence defendants.

N. *Additional Issues*

With our leave, the parties submitted additional supplemental briefing on several other recent changes to the law, specifically Senate Bill No. 567 (2020-2021 Reg. Sess.), which amended our determinate sentencing law, and Senate Bill No. 81 (2021-2022), which amended section 1385 to specify factors that the trial court must consider when

deciding whether to strike enhancements in the interest of justice. Because we have already concluded that the matter must be remanded, including for resentencing, we need not address the parties' disagreements as to how these changes in the law apply here. On resentencing, of course, the trial court will be required to apply these new laws, as well as any other new laws that have gone into effect.

## III. DISPOSITION

We vacate the true findings on gang murder special circumstance (§ 190.2, subd. (a)(22)) as to Monzon, the gang enhancements (§ 186.22, subd. (b)(1)) as to all defendants, and the vicarious liability firearms enhancements (§ 12022.53, subds. (d), (e)) as to all defendants, but the prosecution may elect to retry those allegations under the law as amended by Assembly Bill 333. In any event, defendants shall be resentenced. We also vacate the prior prison term enhancements (§ 667.5, subd. (b)) imposed against Armendariz and Monzon, which may not be retried, but instead are stricken. In all other respects, we affirm the judgments.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL
J.

We concur:

MILLER
Acting P. J.

CODRINGTON
J.

85